IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

THOMAS JOHN HEILMAN,

       Plaintiff,             No. 2:09-cv-2721 JAM KJN P

   vs.

T. LYONS, et al.,              <u>FINDINGS AND RECOMMENDATIONS</u>

       Defendants,

_____/

I.    <u>Introduction</u>

        Plaintiff, a state prisoner proceeding without counsel, seeks relief pursuant to 42 U.S.C. § 1983.  Pending before the court are cross-motions for summary judgment by plaintiff (Dkt. No. 54), and by defendants Lyons, Echevarria, and Esberto[1] (hereafter "defendants") (Dkt. No. 58).  Plaintiff filed an opposition on August 31, 2011.  (Dkt. No 65.)  Defendants filed an opposition on November 4, 2011.  (Dkt. No. 74.)  Plaintiff filed a reply on December 1, 2011, and a correction to the reply on December 7, 2011.  (Dkt. Nos. 75, 76.)  As set forth below, this court recommends that defendants' motion for summary judgment be granted,  and plaintiff's motion for summary judgment be denied.

_____

[1] Defendant Sheldon was served with process late in the proceedings and filed an answer on October 27, 2011.  (Dkt. No. 72.)

1

II.  <u>Allegations</u>

This case is proceeding on the original complaint,[2] filed September 30, 2009. (Dkt No. 1.)  Plaintiff alleges that defendants were deliberately indifferent to his serious medical needs because they denied and delayed him access to medical treatment.  (<u>Id.</u>)

Plaintiff's complaint contains the following allegations:

Plaintiff alleges that on the night of June 30, 2007, while housed in administrative segregation ("ad seg") at California Medical Facility in Vacaville ("CMF"), after eating the evening meal, plaintiff began to feel nauseous.  On July 1, 2007, at breakfast, plaintiff ate a small amount of food, and began to vomit. Plaintiff's condition worsened throughout the day, and included severe stomach pain, cramping, nausea and diarrhea, intense headaches, dizziness, chills, hot and cold flashes and uncontrollable vomiting.  (<u>Id.</u> at 7.)  Plaintiff informed the ad seg correctional officers that plaintiff contracted a food borne illness and requested to see the duty nurse; plaintiff was told that no one was on duty.  No one checked on plaintiff's well-being in ad seg that day, despite allegedly high temperatures (100 degrees outside; 90 degrees inside cell).  (<u>Id.</u> at 10.)

On July 2, 2007, plaintiff told defendant Echevarria that plaintiff was vomiting all night with explosive diarrhea, could barely get out of bed, could not eat, did not want breakfast or lunch, and needed to see a nurse and get medical attention. Plaintiff alleges Echevarria closed the food tray slot but failed to summon the nurse or arrange medical care.  Plaintiff could not hold down liquids that day.  No one checked on plaintiff on July 2, 2007, despite high temperatures.

From July 2, 2007 to July 3, 2007, defendant Lyons worked the first watch shift at ad seg.  Around 2:00 a.m. on July 3, 2007, plaintiff's illness became worse, including severe head pain and explosive diarrhea.  Plaintiff began having dry heaves, which plaintiff claims caused him to black out and lose consciousness. When plaintiff came to, he was on the cell floor, had soiled himself with diarrhea, and called "man down" to defendant Lyons, who found plaintiff sitting on the floor by the toilet.  (<u>Id.</u> at 9.)  Plaintiff told Lyons what happened, and Lyons left, stating she was informing the ad seg First Watch Sergeant.  However, upon return, Lyons allegedly told plaintiff that they decided plaintiff did not require emergency medical care, there was no doctor or nurse available, and no officer could be taken off assigned to duties to escort and stay with plaintiff in the B-1 medical clinic.

---

[2]   The complaint is verified (dkt. no. 1 at 19), and so may be deemed an affidavit for purposes of summary judgment.  <u>Moran v. Selig</u>, 447 F.3d 748, 760 n.16 (9th Cir. 2006).

Plaintiff removed his soiled boxers and placed them in a brown paper bag.[3]  Plaintiff wrapped himself in a sheet, suffering from hot and cold chills, and still unable to drink fluids. Correctional Officer Ramirez, working ad seg breakfast, noticed plaintiff in distress, and informed defendant Esberto, R.N., of plaintiff's emergency medical need.  Plaintiff told Esberto plaintiff had been extremely sick for the past two days, with constant diarrhea, inability to eat or drink, and a loss of consciousness the prior evening.  Plaintiff alleges he told Esberto that plaintiff believed he contracted a food-borne illness because of the unsanitary conditions in ad seg.  Esberto did not summon emergency medical help, but instead removed plaintiff from his cell, hand-cuffed, and put plaintiff in a small wire mesh cage where plaintiff was confronted by 6 or 7 other ad seg staff to determine plaintiff's mental stability.  (Id. at 11.)  Plaintiff alleges he was confronted because Esberto "falsely and mistakenly told these professionals that plaintiff was not eating because 'he was on a hunger strike' as a pretext."  (Id.)  Plaintiff received no medical attention on July 3, 2007.

On July 4, 2007, Officer Ramirez again informed defendant Esberto of plaintiff's medical condition.  At this point, plaintiff claims he was unable to get out of bed and "seemed to be in a semi-conscious state."  (Id. at 11.)  Esberto had plaintiff taken to the B-1 emergency medical clinic where plaintiff was could barely stand or talk, severely dehydrated, and was prescribed anti-nausea/anti-diarrhea medication.  (Id. at 12.)  Plaintiff was admitted to the clinic where he received IV fluids for most of the afternoon.  Plaintiff was diagnosed with severe dehydration brought on by "an unknown stomach virus or other ailment."  (Id.) Plaintiff contends there was an outbreak of the Norovirus throughout California Department of Corrections and Rehabilitation ("CDCR") prisons in the summer of 2007, yet plaintiff was not tested for this virus.  Plaintiff alleges defendants violated the Eighth Amendment because they were deliberately indifferent to plaintiff's serious medical needs, abused their power of authority by making unauthorized and unqualified decisions concerning plaintiff's need for medical care, and despite high temperatures, and plaintiff being on psychotropic or other medications from July 1, 2007, through July 4, 2007, no one offered plaintiff cold liquids or access to cold showers, and no health care personnel checked on plaintiff's well-being on July 1 or 2, 2007, in violation of the Remedial Health Plan (id. at 14), established under Coleman v. Wilson, 912 F.Supp. 1282 (9th Cir. 1995).

////

---

[3]  At some point, plaintiff alleges Esberto put plaintiff's soiled boxers in a pink bio-hazard bag.

1    III.  Causes of Action

2           On March 22, 2010, the court found plaintiff states two cognizable claims for

3    relief:  (1) deliberate indifference to a serious medical need;[4] and (2) unconstitutional conditions

4    of excessive heat, both in violation of the Eighth Amendment.  (Dkt. No. 6 at 2.)

5    IV.  Motion for Summary Judgment

6                  Legal Standard for Summary Judgment

7           Summary judgment is appropriate when it is demonstrated that the standard set

8    forth in Federal Rule of Civil procedure 56(c) is met.  "The judgment sought should be rendered

9    if . . . there is no genuine issue as to any material fact, and that the movant is entitled to judgment

10   as a matter of law."  Fed. R. Civ. P. 56(c).

11               Under summary judgment practice, the moving party
                 always bears the initial responsibility of informing the district court
12               of the basis for its motion, and identifying those portions of "the
                 pleadings, depositions, answers to interrogatories, and admissions
13               on file, together with the affidavits, if any," which it believes
                 demonstrate the absence of a genuine issue of material fact.
14

15   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

16   burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

17   in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on

18   file.'"  Id., citing Fed. R. Civ. P. 56(c).  Indeed, summary judgment should be entered, after

19

20        [4] Thus, plaintiff's allegations in Claim 2 that defendants Lyons, Echevarria and Sheldon
     violated prison regulations or policies by making medical decisions are not cognizable.  There is
     no independent cause of action under § 1983 for a violation of Title 15 regulations.  See, e.g.,
21   Chappell v. Newbarth, 2009 WL 1211372, at *9 (E.D. Cal. May 1, 2009) (holding that there is
     no private right of action under Title 15 of the California Code of Regulations); Parra v.
22   Hernandez, 2009 WL 3818376, at **2, 8 (S.D. Cal. Nov. 13, 2009) (same).  "To the extent that
     the violation of a state law amounts to the deprivation of a state-created interest that reaches
23   beyond that guaranteed by the federal Constitution, [s]ection 1983 offers no redress."  Sweaney
     v. Ada County, Idaho, 119 F.3d 1385, 1391 (9th Cir. 1997); see also Davis v. Kissinger, 2009
24   WL 256574, *12 n. 4 (E.D. Cal. Feb. 3, 2009) ("there is not a single reported state or federal case
     permitting an independent cause of action pursuant to these regulations [Cal. Code Regs. tit. 15
25   § 3268]").  Similarly, there is no liability under § 1983 for violating prison policy.  Cousins v.
     Lockyer, 568 F.3d 1063, 1070 (9th Cir. 2009).  Therefore, the court does not address plaintiff's
26   Claim 2 as it was screened out by the March 22, 2010 order.  (Dkt. No. 6 at 2.)

                                              4

adequate time for discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial. Id. at 322.  "[A] complete failure of proof concerning

an essential element of the nonmoving party's case necessarily renders all other facts

immaterial." Id. at 323.  In such a circumstance, summary judgment should be granted, "so long

as whatever is before the district court demonstrates that the standard for entry of summary

judgment, as set forth in Rule 56(c), is satisfied."  Id.

       If the moving party meets its initial responsibility, the burden then shifts to the

opposing party to establish that a genuine issue as to any material fact actually exists.  See

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

establish the existence of such a factual dispute, the opposing party may not rely upon the

allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

form of affidavits, and/or admissible discovery material in support of its contention that the

dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

1436 (9th Cir. 1987).

       In the endeavor to establish the existence of a factual dispute, the opposing party

need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary

judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

1   committee's note on 1963 amendments).

2           In resolving a summary judgment motion, the court examines the pleadings,

3   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

4   any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

5   477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

6   court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

7   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

8   produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

9   Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

10  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

11  show that there is some metaphysical doubt as to the material facts . . .  Where the record taken

12  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

13  'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

14          By order filed May 20, 2010, the court advised plaintiff of the requirements for

15  opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt.

16  No. 11); see Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v.

17  Eikenberry, 849 F.2d 409 (9th Cir. 1988).

18  V.  Facts

19          For purposes of summary judgment, the court finds that the following facts are

20  either not disputed, or, following the court's review of the evidence submitted, are deemed

21  undisputed, unless otherwise indicated:

22          1.  At all relevant times, plaintiff was incarcerated at CMF.

23          2.  At all relevant times, defendants were employed by the CDCR.

24          3.  Defendants Lyons and Echevarria worked as correctional officers, and

25  defendant Esberto, a Registered Nurse, worked as a correctional nurse.

26          4.  At all relevant times, defendants were assigned to CMF I-3 ad seg wing.

5.  Plaintiff alleges he contracted a "food borne illness" on or about June 30, 2007.

6.  On July 1, 2007 and July 2, 2007, defendant Echevarria was on duty at CMF from 7:00 a.m. to 3:00 p.m.

7.  Plaintiff alleges that he informed ad seg correctional officers, including defendant Echevarria, on July 1, 2007, that plaintiff contracted a food borne illness from the night before, requested medical assistance, and was told there was no nurse on duty.  Defendants dispute this allegation; defendants contend plaintiff did not appear to be subject to a medical emergency, and did not request medical care on July 1, 2007, and that a nurse is assigned to each wing.

8.  Plaintiff alleges he spoke to defendant Echevarria on July 2, 2007,  and requested medical attention.  Plaintiff contends he described his symptoms, and that defendant Echevarria responded by closing the food tray slot and leaving.  Defendant Echevarria did not summon emergency medical assistance.  Defendant Echevarria disputes these allegations, declaring he does not recall plaintiff asking for medical care on July 2, 2007.

9.  According to the ad seg unit Log Book, breakfast and lunch were passed out at 0620, prior to defendant Echevarria's shift.

10.  Defendant Echevarria did not distribute meals to the ad seg unit on the morning of July 2, 2007.

11.  Daily activity records indicate that meals were served to plaintiff on July 2, 2007, without refusal.  Plaintiff disputes this fact, claiming different staff members do not always keep the Log Book records "correct and documented."  (Dkt. No. 65-1 at 7.)

12.  On July 2, 2007, plaintiff did not appear ill to defendant Echevarria.  Plaintiff disputes this fact, claiming plaintiff informed defendant Echevarria of plaintiff's illness.

13.  The Log Book records do not show any complaint made by plaintiff during defendant Echevarria's watch on July 2, 2007.  Plaintiff disputes this fact, for the same reason stated in No. 11.

7

14.   On July 2, 2007, staff marked off plaintiff as having completed a shower under the "Record of Daily Activity."  (Dkt. No. 58-3 at 9.)

15.   Defendant Echevarria was not on duty on July 3, 2007, or July 4, 2007.

16.   Defendant Echevarria has undergone institutional training to recognize signs of heat-related illness.

17.   On July 2, 2007, defendant Lyons was assigned first and third watch at CMF.

18.   On July 3, 2007, defendant Lyons was assigned first watch at CMF.

19.   Defendant Lyons' duties as a correctional officer included half-hour security checks.

20.   At approximately half-hour intervals, prison staff in the I-3 ad seg wing at CMF are to document the institutional security checks and inmate activities in a handwritten "Log Book."  Plaintiff contends that different staff members do not always document inmate activities as required by CDCR procedures.

21.   CDCR procedures provide that if an inmate suffers a medical emergency, staff are to enter the time and circumstances in the Log Book.

22.   On or about 2:00 a.m.[5] on July 3, 2007, plaintiff advised defendant Lyons that his stomach hurt and he had diarrhea.  Plaintiff contends he called out "man down," but defendant Lyons has no recollection of plaintiff calling "man down."  The subsequent verbal exchange between plaintiff and defendant Lyons is disputed.  Plaintiff contends he told defendant Lyons that plaintiff needed emergency medical care because plaintiff had lost consciousness and had a dysentery-like condition.  Plaintiff also contends that defendant Lyons failed to document plaintiff's request for emergency medical assistance on any I-3 ad seg Log Book or in plaintiff's personal detention record.

23.   Plaintiff alleges that defendant Lyons did not consider his condition an

---

[5]  Plaintiff claims it was around 2:00 a.m.; defendant Lyons claims it was 2:30 a.m.

emergency.  Plaintiff further contends that defendant Lyons refused to provide emergency

medical care because in Lyons' and her supervisor's opinion, plaintiff's request for medical care

and treatment was unwarranted.

24.  On July 3, 2007, defendant Lyons contacted B-1 nurse in response to

plaintiff's complaint.

25.  On July 3, 2007, defendant Lyons notified her superior of plaintiff's

complaints.[6]

26.  Defendant Lyons noted that plaintiff appeared to be talking and breathing

fine.[7]

27.  Later that morning, defendant Lyons observed plaintiff to be sleeping.[8]

28.  Plaintiff's complaint and the staff observations were noted in the ad seg Log

Book.[9]  Plaintiff disputes this, claiming that defendant Lyons only recorded "a self-serving

_____

[6]  Plaintiff disputes the language used as to what defendant Lyons told her supervisor regarding plaintiff's complaints.  However, plaintiff was not privy to this conversation, and presents no contrary evidence, other than plaintiff's speculation as to what Lyons told her supervisor.

[7]  Plaintiff disputes this fact by stating he "requested medical care at intervals throughout defendant Lyons' first watch shift."  (Dkt. No. 65-1 at 5.)

[8]  Plaintiff disputes this fact; he claims he was severely ill and requested medical assistance by pleading with defendant Lyons throughout her first watch shift.  (Dkt. No. 65-1 at 6.)  Plaintiff contends defendant Lyons refused to summon emergency medical assistance.  (Id.)

[9]  The Log Book entry for July 3, 2007, states:

[Plaintiff] advised me his stomach hurt and he had diarrhea.  I called B1 nurse [who] says to ask him if he can wait until 7 a.m. when triage opens, or does he need to be assessed now.  [Plaintiff] doesn't understand why Dr. not here now.  Sgt. notified.  [Plaintiff] lying on bed talking and breathing fine.

0300 . . . note [plaintiff] says it's not an ER[,] he will wait for triage.  If he can't[,] he will let me know.

0330 . . . [plaintiff] sleep.

1  account" of what happened, rather than the symptoms plaintiff relayed.  (Dkt. No. 65-1 at 6.)

2          29.  Daily activity records indicate plaintiff refused breakfast and lunch on July 3,

3  2007.  (Dkt. No. 65-2 at 31.)

4          30.  Defendant Lyons' shift ended at 6:00 a.m. on July 3, 2007.  However,

5  plaintiff claims that his further calls for medical assistance between 2:00 a.m. and 6:00 a.m. were

6  ignored by defendant Lyons.

7          31.  Defendant Esberto was on duty at CMF on July 3, 2007, and July 4, 2007.

8          32.  Defendant Esberto's normal shift was 7:30 a.m. to 3:30 p.m.

9          33.  Defendant Esberto's responsibilities in CMF's ad seg unit included

10 examining inmates as necessary, and documenting such examinations.[10]

11         34.  Defendant Esberto did not receive a request for a medical examination of

12 plaintiff on July 3, 2007.[11]  Plaintiff contends that on July 3, 2007, he told Esberto that plaintiff

13 had been "extremely sick" for two days, with "constant diarrhea," and that plaintiff was not able

14 _____

15 (Dkt. No. 58-2 at 5.)

16      [10]  Plaintiff disputes this fact, claiming, without evidence, that Esberto's duties and
responsibilities are "far more extensive than stated."  (Dkt. No. 65-1 at 8.)  Plaintiff also claims
17 that defendant Esberto claimed she did not keep any type of medical log book or medical notes
for I-3 ad seg, subsequently only documenting inmate and other medical and nonmedical issues
18 in inmate medical files, citing numerous interrogatory responses by Esberto.  (Id.)  However,
none of the interrogatories cited by plaintiff asked defendant Esberto that specific question.  In
19 response to plaintiff's interrogatory no. 11, whether Esberto documented the July 3, 2010
meeting in the ad seg Log Book, Esberto responded that she had no recollection.  (Dkt. No. 65-2
20 at 19.)  In response to plaintiff's interrogatory no. 21, whether Esberto documented plaintiff's
need for medical attention from July 1 - 4, 2007, in the ad seg daily medical log book or ad seg
21 wing Log Book, Esberto responded that she "did document in [her] medical notes on July 4,
2007."  (Dkt. No. 65-2 at 22.)  In response to interrogatory no. 22, whether Esberto documented
22 visiting all I-3 ad seg wing inmates on July 1 - 4, 2007, Esberto responded:  "I document all
required medical examinations of inmates."  (Dkt. No. 65-2 at 22.)  None of these responses can
23 be fairly read as making the statement plaintiff attributed to defendant Esberto.

24      [11]  Plaintiff confirms that Esberto did not receive a written request, but claims Officer
Ramirez verbally informed Esberto that plaintiff had a medical emergency.  (Dkt. No. 65-1 at 9.)
25 However, plaintiff does not state he was present during this alleged exchange between Ramirez
and Esberto, and provides no declaration from Officer Ramirez confirming what Officer Ramirez
26 told Esberto.

to eat or drink.  (Dkt. No. 55 at 10.)  Plaintiff contends that Esberto had plaintiff removed from his cell and reviewed by the ad seg Interdisciplinary Treatment Team ("IDTT") rather than provide plaintiff medical treatment.  (Id. at 11.)  Plaintiff claims Esberto told mental health staff and custody officers that plaintiff was not sick, but was staging a hunger strike.[12]  (Id. at 10.)

35.  There is no documentation of an examination of plaintiff on July 3, 2007. Plaintiff does not dispute that there is no such documentation, but claims that defendant Esberto did not document plaintiff's request to conceal defendant's alleged refusal to provide medical care on July 3, 2007.  (Dkt. No. 65-1 at 9.)

36.  Defendant Esberto saw plaintiff on July 4, 2007, during her shift as a triage nurse.

37.  On July 4, 2007, at 10:00 a.m., plaintiff was seen and treated with IV fluids in the prison medical clinic for complaints of nausea, vomiting, and headache.

38.  On July 4, 2007, on the health care service request form, defendant Esberto recorded plaintiff's complaints as follows:

> Inmate claims he has not been eating for four days now because he has bug in his stomach due to staff are touching his foods.  C/O nausea and vomiting and headache.

(Dkt. No. 58-4 at 7.)  Plaintiff contends this understates plaintiff's conversation with defendant Esberto.  (Dkt. No. 65-1 at 10.)  Plaintiff contends he was suffering from dehydration, mental confusion, dizziness, and lethargy, and that defendant Esberto observed plaintiff's condition to be serious.  (Id.)

39.  The medical record from the July 4, 2007 examination reflects an initial diagnosis of gastroenteritis (viral) at 12:20 p.m., and a diagnosis of gastroenteritis and dehydration at 12:36 p.m.  (Dkt. No. 65-2 at 67-68.)  After receiving IV fluids, plaintiff was released to his cell, from the clinic, at 2:35 p.m. on July 4, 2007, in stable condition.  Plaintiff

---

[12]  Plaintiff provides no declarations from mental health or custody staff confirming this took place, or that Esberto claimed plaintiff was staging a hunger strike.

was prescribed anti-diarrhea medication and a liquid diet.

40.  Daily activity records indicate plaintiff refused breakfast and lunch on July 4, 2007.  (Dkt. No. 65-2 at 31.)

41.  During plaintiff's illness, plaintiff was not denied access to drinking water.

42.  Plaintiff alleges he received no medical attention from the defendants from July 1 through 3, 2007.

43.  Plaintiff states he lost weight during his stomach illness,[13] and alleges he could have died because of the alleged delay in care.

44.  Plaintiff contends that after his return to his cell, after treatment on July 4, 2007, plaintiff continued to suffer from this illness.  (Dkt. No. 65-1 at 10.)

45.  Defendants Echevarria and Lyons have had no formal training as a physician, nurse or emergency medical training.

46.  Defendants Echevarria and Lyons have undergone training to recognize signs of heat-related illness, during the course of their CDCR employment, and have participated in medical response training for correctional officers as required by CDCR.

VI.  Eighth Amendment Claims

A.  Conditions of Confinement:  Claim of Excessive Heat

In his third claim, plaintiff alleges he was subjected to excessive heat, and that defendants failed to comply with a Remedial Heat Plan protocol.

1.  Legal Standards

The Eighth Amendment proscribes conditions of confinement constituting cruel and unusual punishment.  The Eighth Amendment's prohibition against cruel and unusual punishment imposes duties on prison officials to "provide humane conditions of confinement." Farmer v. Brennan, 511 U.S. 825, 832 (1994).  To establish a violation of the Eighth

---

[13]  On July 4, 2007, plaintiff's weight was recorded as 170.  (Dkt. No. 65-2 at 11.) Plaintiff provides no evidence as to his prior weight.

Amendment, a prisoner must show that he was, objectively, deprived of something "sufficiently serious." Id. at 834.  A deprivation is sufficiently serious when the prison official's act or omission results "in the denial of 'the minimal civilized measure of life's necessities.'" Id., quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  Next, the prisoner must show that the deprivation occurred as a result of deliberate indifference to the inmate's health or safety; this determination is premised on an assessment of the prison official's subjective state of mind.  Id., citing Wilson v. Seiter, 501 U.S. 294, 302-03 (1991).

Thus, to state a claim under the Eighth Amendment, the prisoner must show not only that prison officials were subjectively and actually indifferent to the plight he alleges, but also that the conditions themselves were objectively sufficiently serious to acquire constitutional dimension; that is, the conditions "must result in the denial of the minimal civilized measure of life's necessities." Farmer, 511 U.S. at 834 (quoting Rhodes, 452 U.S. at 347).

Generally, only the most severe deprivations can support an Eighth Amendment claim.  However, "[m]ore modest deprivations can also form the objective basis of a violation, but only if such deprivations are lengthy or ongoing." See Johnson v. Lewis, 217 F.3d 726, 732 (9th Cir. 2000) (receipt of inedible food, inadequate drinking water, and inadequate access to toilets for four days constitutes sufficiently serious deprivation).  "To find an Eighth Amendment violation, courts must identify specific conditions that fail to meet Eighth Amendment requirements." Hoptowit, 682 F.2d at 1247; see also id. n.3.  A "totality of circumstances" test is not to be applied. Id. at 1247.

2. Analysis

Plaintiff claims that defendants were deliberately indifferent to conditions of excessive heat exposure from July 1 to 4, 2007.  Plaintiff alleges outside temperatures were 100 degrees, and that indoor temperatures were 90 degrees.  (Dkt. No. 1 at 10.)  However, plaintiff provides no evidence documenting these temperatures.  Plaintiff did provide a copy of a document entitled "Patient Education for Heat Plan," but the form contains no date, and although

1   it provides signature lines for a patient and staff, no signature is on the form, and the form makes

2   no reference to plaintiff or to CMF.  (Dkt. No. 65-2 at 35.)  In his reply, plaintiff states that CMF

3   "established its own Remedial Heat Plan."  (Dkt. No. 76 at 5.)  However, plaintiff provides no

4   citation to, nor copy of, the Remedial Heat Plan in effect at CMF during the relevant time

5   frame.[14]  In his verified complaint, plaintiff alleges he "was on psychotropic or other

6   medications" (dkt. no. 1 at 14), and in his opposition claims he was prescribed psych medication

7   (dkt. no. 65 at 25), during the relevant period, but plaintiff provided no evidence demonstrating

8   plaintiff was prescribed a medication specifically covered by a CMF Remedial Heat Plan during

9   the relevant time frame.

10          Taking plaintiff's declaration that he was prescribed psychotropic medications

11  during the relevant time frame as true, plaintiff fails to demonstrate that any CMF Remedial Heat

12  Plan was violated, or that temperatures during the relevant time frame warranted implementation

13  of the alleged Remedial Heat Plan.  Therefore, defendants are entitled to summary judgment on

14  that basis.

15          However, even if the court accepts the Patient Education for Heat Plan as the

16  applicable protocol for CMF during the relevant time frame, the result is the same.  Pursuant to

17  Rule 201 of the Federal Rules of Evidence,[15] the court takes judicial notice of the historical

18  weather records for zip code 95696, where CMF is located:

19          June 30, 2007 - maximum temperature 80.6 degrees

20          July 1, 2007 - maximum temperature 82.4 degrees

21

22  [14]  As noted by defendants, plaintiff relies heavily on the Coleman v. Wilson class action
    for his claim that he was to be treated in accordance with a mandatory protocol to prevent heat-
23  related illness.  Id., 912 F.Supp. 1282 (E.D. Cal. 1995).  Inmates confined at CMF were expressly
    exempted from the class certification in Coleman.  Id. at 1293.  Because plaintiff is not a member
24  of the Coleman class, he is not bound by the Coleman judgment.

25  [15]  See also Del Raine v. Williford, 32 F.3d 1024, 1036 n.4 (7th Cir. 1994) (noting with
    approval district court's order taking judicial notice of air temperatures of nearest airport for
26  purposes of determining temperatures in the prison).

1          July 2, 2007 - maximum temperature 89.6 degrees

2          July 3, 2007 - maximum temperature 91.4 degrees

3          July 4, 2007 - maximum temperature 102.2 degrees

4   The Old Farmer's Almanac, almanac.com (2012),  http://www.almanac.com/weather/history/

5   zipcode/95696 (last visited January 26, 2012).

6          The education plan provided by plaintiff states that patients will remain indoors

7   when the outdoor temperature reaches 90 degrees or greater, and that when indoor temperatures

8   reach 85 degrees or greater, certain additional provisions come into effect.  (Dkt. No. 65-2 at 35.)

9   Here, plaintiff suggests that the inside temperature at the prison runs 10 degrees cooler than the

10  outside temperature.  (Dkt. No. 1 at 10 [100 - 90 = 10].)  Taking plaintiff's temperature

11  differential as true, the inside temperatures at the prison did not reach or exceed 85 degrees until

12  July 4, 2007, the day plaintiff was seen at the medical clinic.  Therefore, under the education plan

13  provided by plaintiff, prison officials were not required to implement the education plan protocol

14  until July 4, 2007.

15         Moreover, the medical records do not indicate heat or heat stress played a role in

16  plaintiff's illness.  Rather, plaintiff claims he became ill as the result of staff members touching

17  his food, and alleges his illness began on the evening of June 30, 2007, after the evening meal.

18  Although it would be cooler in the evening, the high temperature on June 30, 2007, was 80.6, not

19  high enough to induce heat stress or heat-related illness.  Plaintiff does not allege that he

20  complained of heat issues to prison officials, and there is no mention of any heat-related

21  complaints in the medical records provided.  Moreover, plaintiff fails to demonstrate he was

22  subjected to continuous periods of excessive heat.  The increase in temperatures from June 30,

23  2007, to July 3, 2007, was fairly incremental, particularly from June 30 to July 1, and from July 2

24  to July 3, and the temperature did not hit triple digits until July 4, 2007, the day plaintiff received

25  medical treatment.  These temperatures fail to demonstrate plaintiff was at substantial risk of

26  serious harm, Farmer, 511 U.S. at 837, due to excessive heat conditions.

1    For all of the above reasons, plaintiff fails to demonstrate that a substantial risk of

2  serious harm existed due to heat conditions, or that he was subjected to a lengthy or ongoing

3  exposure to excessive heat.  Thus, plaintiff's third claim for relief should be denied.

4    3.  <u>Conclusion:  Excessive Heat Claim</u>

5    For all of the above reasons, defendants are entitled to summary judgment on

6  plaintiff's third claim.

7    B.  <u>Eighth Amendment:  Medical Care Claim</u>

8    In his first claim, and part of his second claim for relief, plaintiff alleges

9  defendants were deliberately indifferent to plaintiff's serious medical needs.

10    1.  <u>Legal Standards - Medical Care</u>

11    Generally, deliberate indifference to a serious medical need presents a cognizable

12  claim for a violation of the Eighth Amendment's prohibition against cruel and unusual

13  punishment.  <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976).  According to <u>Farmer</u>, "deliberate

14  indifference" to a serious medical need exists "if [the prison official] knows that [the] inmate [ ]

15  face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable

16  measures to abate it."  <u>Id.</u> 511 U.S. at 847.  The deliberate indifference standard "is less stringent

17  in cases involving a prisoner's medical needs than in other cases involving harm to incarcerated

18  individuals because 'the State's responsibility to provide inmates with medical care ordinarily

19  does not conflict with competing administrative concerns.'"  <u>McGuckin v. Smith</u>, 974 F.2d 1050,

20  1060 (9th Cir. 1992) (quoting <u>Hudson v. McMillian</u>, 503 U.S. 1, 6 (1992)), <u>overruled</u> <u>on</u> <u>other</u>

21  <u>grounds</u> <u>by</u> <u>WMX Technologies, Inc. v. Miller</u>, 104 F.3d 1133 (9th Cir. 1997).  Specifically, a

22  determination of "deliberate indifference" involves two elements:  (1) the seriousness of the

23  prisoner's medical needs; and (2) the nature of the defendant's responses to those needs.

24  <u>McGuckin</u>, 974 F.2d at 1059.

25    First, a "serious" medical need exists if the failure to treat a prisoner's condition

26  could result in further significant injury or the "unnecessary and wanton infliction of pain."  <u>Id.</u>

16

1   (citing Estelle, 429 U.S. at 104).  Examples of instances where a prisoner has a "serious" need for

2   medical attention include the existence of an injury that a reasonable doctor or patient would find

3   important and worthy of comment or treatment; the presence of a medical condition that

4   significantly affects an individual's daily activities; or the existence of chronic and substantial

5   pain.  McGuckin, 974 F.2d at 1059-60 (citing Wood v. Housewright, 900 F.2d 1332, 1337-41

6   (9th Cir. 1990)).

7          Second, the nature of a defendant's responses must be such that the defendant

8   purposefully ignores or fails to respond to a prisoner's pain or possible medical need in order for

9   "deliberate indifference" to be established.  McGuckin, 974 F.2d at 1060.  Deliberate

10  indifference may occur when prison officials deny, delay, or intentionally interfere with medical

11  treatment."  Hutchinson v. United States, 838 F.2d 390, 392 (9th Cir. 1988).  In order for

12  deliberate indifference to be established, there must first be a purposeful act or failure to act on

13  the part of the defendant and resulting harm.  See McGuckin, 974 F.2d at 1060.  "A defendant

14  must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order

15  for deliberate indifference to be established."  Id.  Second, there must be a resulting harm from

16  the defendant's activities.  Id.  The needless suffering of pain may be sufficient to demonstrate

17  further harm.  Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002).

18         Where the claim is based on a delay in treatment, "a prisoner can make 'no claim

19  for deliberate medical indifference unless the denial was harmful.'"  McGuckin at 1060 (quoting

20  Shapley v. Nevada Board of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985)(per

21  curiam)).  The harm caused by the delay need not, however, be "substantial."  McGuckin at 1060

22  (citing Wood, 900 F.2d at 1339-40; also citing Hudson, 503 U.S. at 5-10).  A showing of merely

23  inadvertent or even negligent medical care is not enough to establish a constitutional violation.

24  Estelle, 429 U.S. at 105-06; Frost v. Agnos, 152 F.3d 1124, 1130 (9th Cir. 1998).

25         In order to defeat defendants' motion for summary judgment, plaintiff must

26  "produce at least some significant probative evidence tending to [show]," T.W. Elec. Serv., 809

17

1   F.2d at 630, that defendants' actions, or failures to act, were "in conscious disregard of an

2   excessive risk to plaintiff's health," Jackson v. McIntosh, 90 F.3d 330, 332 (1996) (citing

3   Farmer, 511 U.S. at 837).

4                    2.   Analysis

5                         i.   Defendant Echevarria

6             Although the ad seg Log Book does not reflect this fact, and defendant Echevarria

7   does not recall, plaintiff alleges he advised defendant Echevarria on the morning of July 2, 2007,

8   that plaintiff had been vomiting all night and through the morning, with explosive diarrhea, and

9   could not eat, and requested immediate medical attention.  Taking plaintiff's allegations as true,

10  plaintiff has failed to demonstrate that defendant Echevarria acted with a culpable state of mind.

11  Defendant Echevarria declares that plaintiff did not appear ill.  Plaintiff presents no evidence

12  contradicting how defendant Echevarria viewed plaintiff.  Indeed, the description of plaintiff's

13  symptoms could be mistaken for the stomach flu, for which most people do not need or seek

14  medical care.  See Malone v. Ford, 2007 WL 6080431, *2 (E.D. Va. 2007) ("medical staff

15  diagnosed plaintiff with viral gastroenteritis, which is commonly referred to as the stomach flu.")

16  See also Metropolitan Life Ins. Co. v. Main, 383 F.2d 952 (5th Cir. 1967) ("Dr. Couch treated

17  Main . . . for gastroenteritis, usually called 24 to 48 hour flu by laymen.")

18            Although plaintiff contends defendant Echevarria refused to summon emergency

19  medical assistance, plaintiff's facts, taken as true, demonstrate defendant Echevarria had a

20  difference of opinion with plaintiff as to whether plaintiff required medical care.  It is also

21  undisputed that plaintiff had access to running water, a toilet, and a bed during his illness.  As

22  noted above, differences of opinion concerning the appropriate treatment cannot be the basis of

23  an Eighth Amendment violation.  Jackson, 90 F.3d at 332.  Thus, even taking plaintiff's facts as

24  true, defendant Echevarria's failure to summon medical care on July 2, 2007, does not rise to the

25  level of deliberate indifference.  Although plaintiff contends his pain and suffering could have

26  been prevented had defendant Echevarria summoned emergency medical care for plaintiff,

1  plaintiff adduces no evidence or expert medical opinion demonstrating that alleged fact.  The

2  medical records reflect that plaintiff suffered from a virus, which is usually not treated by

3  antibiotics.  Plaintiff complained of flu-like symptoms.  Plaintiff adduces no evidence

4  demonstrating that defendant Echevarria was aware that plaintiff had gastroenteritis, or that

5  plaintiff's symptoms would get worse.  It is undisputed that defendant Echevarria has had no

6  formal training as a physician, nurse, or emergency medical technician.  Moreover, it is

7  undisputed that defendant Echevarria's shift ended at 3:00 p.m. on July 2, 2007, and he was not

8  working on July 3 or 4, 2007.  Because defendant Echevarria was not on duty, he cannot be held

9  responsible for alleged delays in medical care from 3:00 p.m. on July 2, 2007, through July 4,

10  2007.  For all of these reasons, defendant Echevarria is entitled to summary judgment.

11         Plaintiff's allegations concerning correctional officers' alleged failure to summon

12  medical assistance for plaintiff on July 1, 2007, fail for the same reasons.  While plaintiff

13  maintains he required emergency medical assistance on July 1, 2007, correctional officers did not

14  summon such assistance, raising an inference that they did not believe plaintiff required such

15  urgent assistance.  Plaintiff adduces no evidence to the contrary.  Given the fact that plaintiff was

16  in the early stages of his illness, and his symptoms were flu-like in nature, correctional officers'

17  alleged failure to summon medical assistance on July 1, 2007, absent evidence to the contrary,

18  constituted a difference of opinion as to the need for medical care, rather than deliberate

19  indifference.

20                              ii.  Defendant Lyons

21         Plaintiff's allegations as to defendant Lyons fail for the same reasons.  Plaintiff

22  alleges that defendant Lyons was deliberately indifferent to plaintiff's serious medical needs on

23  July 3, 2007.  It is undisputed that Lyons did not call for emergency medical assistance for

24  plaintiff on July 3, 2007.  But it is also undisputed that defendant Lyons contacted the B-1 nurse

25  ////

26  ////

1   in response to plaintiff's complaint, and notified her superior of plaintiff's complaints.[16]  While

2   there are disputes of fact as to the verbal exchanges between plaintiff and defendant Lyons,

3   taking plaintiff's allegations as true, defendant Lyons had a difference of opinion with plaintiff as

4   to whether he required emergency medical treatment.  As noted above, plaintiff suffered from

5   flu-like symptoms.  Furthermore, there is no indication that Lyons knew that plaintiff faced a

6   substantial risk of serious harm and disregarded that risk by failing to take reasonable steps to

7   abate it.  See Farmer, 511 U.S. at 837.  Or, put differently, there is no indication that Lyons opted

8   not to seek further medical treatment for plaintiff in conscious disregard of an excessive risk to

9   plaintiff's health.  See Toguchi, 391 F.3d at 1058; Jackson, 90 F.3d at 332.  Plaintiff adduces no

10  evidence demonstrating that defendant Lyons was aware that plaintiff's condition would get

11  worse, or that plaintiff would become dehydrated.  It is undisputed that defendant Lyons has had

12  no formal training as a physician, nurse, or emergency medical technician.

13          Moreover, it is undisputed that defendant Lyons' shift ended at 6:00 a.m. on July

14  3, 2007.  Medical records demonstrate that plaintiff presented at B-1 medical clinic at 10:00 a.m.

15  on July 4, 2007.  Although plaintiff contends his pain and suffering could have been prevented

16  had defendant Lyons earlier summoned medical assistance, plaintiff presents no evidence or

17  expert medical opinion demonstrating that alleged fact.  The medical records reflect that plaintiff

18  suffered from a virus, which is usually not treated with antibiotics, but has to run its course.

19  Taking plaintiff's allegations as true, the court cannot find that the delay from July 3, 2007, to

20  July 4, 2007, when plaintiff presented to the B-1 medical clinic, constituted an Eighth

21  Amendment violation.  See Estelle, 429 U.S. at 105-06.  In addition, plaintiff fails to demonstrate

22  that any delay attributable to defendant Lyons resulted in substantial harm.  While plaintiff

23  experienced pain and suffering from his vomiting and diarrhea, he presents no evidence that,

24  

25      [16]  Plaintiff contends that the language "plaintiff's complaints" is ambiguous and does not
    relate the seriousness of plaintiff's request for emergency medical care.  (Dkt. No. 65 at 38.)
    However, plaintiff was not privy to this conversation, and fails to adduce evidence to the

26  contrary.

1 absent earlier treatment, his symptoms would have abated.  Indeed, plaintiff declares that he

2 continued to suffer from his condition even after he received medical treatment.  (Dkt. No. 65-1

3 at 10.)  For all of these reasons, defendant Lyons is also entitled to summary judgment.

4                                   iii.  Defendant Esberto

5           Plaintiff's claims against defendant Esberto fail for similar reasons.  It is

6 undisputed that defendant Esberto is a Registered Nurse, and there are disputes of fact as to

7 whether defendant Esberto was aware of plaintiff's condition on July 3, 2007.  Plaintiff does not

8 indicate what time on July 3, 2007, defendant Esberto allegedly saw plaintiff.  The Record of

9 Daily Activity log reflects plaintiff was seen by IDTT between 9:00 and 9:30 a.m.  (Dkt. No. 65-

10 2 at 31.)  Thus, taking plaintiff's allegations as true, he would have advised defendant Esberto of

11 his condition prior to 9:00 a.m. on July 3, 2007.  Because plaintiff was seen in the medical clinic

12 at 10:00 a.m. on July 4, 2007, defendant Esberto's alleged failure to provide medical care to

13 plaintiff on July 3, 2007, resulted in approximately a one day delay in treatment.

14           Deliberate indifference may be manifested by the intentional denial, delay, or

15 interference with the plaintiff's medical care.  See Estelle, 429 U.S. at 104-05; Wakefield v.

16 Thompson, 177 F.3d 1160, 1165 (9th Cir. 1999).  However, the defendant must purposefully

17 ignore or fail to respond to the plaintiff's pain or medical needs.  See McGuckin, 974 F.2d at

18 1060.  Thus, an inadvertent failure to provide adequate medical care, or mere negligence or

19 medical malpractice, or a mere delay in medical care (without more), or a difference of opinion

20 over proper medical treatment, is insufficient to violate the Eighth Amendment.  See Estelle, 429

21 U.S. at 105-06 (inadvertent failure to provide adequate medical care is not "an unnecessary and

22 wanton infliction of pain"); Wakefield, 177 F.3d at 1165 ("mere negligence in the provision of

23 medical care does not constitute a constitutional violation"); see also Sanchez v. Vild, 891 F.2d

24 240, 242 (9th Cir. 1989) (difference of opinion regarding medical treatment does not amount to

25 deliberate indifference).

26           Taking plaintiff's facts as true, defendant Esberto was not deliberately indifferent

                                            21

to plaintiff's serious medical needs; rather, defendant Esberto had a difference of opinion with

plaintiff as to the nature of, or misdiagnosed, plaintiff's condition.  Such a difference of opinion

or misdiagnosis, even if grossly negligent, is insufficient to establish deliberate indifference.

Estelle, 429 U.S. at 106.  Moreover, it is undisputed that plaintiff was treated the next day.

Although plaintiff claims he needed emergency medical attention, plaintiff is not a doctor, and

provides no medical evidence demonstrating he required emergency or earlier medical attention.

Plaintiff adduces no evidence that he was dehydrated on the morning of July 3, 2007, or that

defendant Esberto was aware that plaintiff was dehydrated.

   The Ninth Circuit has made clear that "[w]hile poor medical treatment will at a

certain point rise to the level of a constitutional violation, mere malpractice, or even gross

negligence does not suffice."  Wood, 900 F.2d at 1334; McGuckin, 974 F.2d at 1060 ("A finding

that the defendant's neglect was an 'isolated occurrence' or an 'isolated exception,' . . . militates

against a finding of deliberate indifference").  Even if plaintiff told Esberto that plaintiff suffered

from continuous vomiting and explosive diarrhea, Esberto's failure to provide urgent medical

care for plaintiff was, at most, grossly negligent in the absence of evidence that Esberto

consciously disregarded an excessive risk to plaintiff's health.  While plaintiff was certainly

suffering from the symptoms of gastroenteritis, an additional day of vomiting and diarrhea is not

the type of "substantial harm" that constitutes an Eighth Amendment violation.  See e.g.,

O'Loughlin v. Doe, 920 F.2d 614, 617 (9th Cir. 1990) (repeatedly failing to satisfy requests for

aspirins and antacids to alleviate headaches, nausea and pains is not constitutional violation;

isolated occurrences of neglect may constitute grounds for medical malpractice, but do not rise to

level of unnecessary and wanton infliction of pain); Anthony v. Dowdle, 853 F.2d 741, 743 (9th

Cir. 1988) (no more than negligence stated where prison warden and work supervisor failed to

provide prompt and sufficient medical care); Wood, 900 F.2d at 1334, 1335 (affirming finding

that 11-day delay in treatment for broken orthopedic pin in inmate's shoulder did not cause

sufficient harm in part because "the only remedy immediately available was a prescription for

1  painkillers.");  Mayfield v. Craven, 433 F.2d 873, 874 (9th Cir. 1970) (per curiam) (11-day delay

2  in treating inmate's "serious facial bone fractures" did not violate Eighth Amendment);  Shapley,

3  766 F.2d at 407 (a five year delay in recommended knee surgery, without more, was insufficient

4  to state a claim of deliberate indifference because "delay in medical treatment must have caused

5  substantial harm" to constitute Eighth Amendment violation); cf. Hunt v. Dental Dept., 865 F.2d

6  198, 201 (9th Cir. 1989) (three-month delay in replacing dentures, causing gum disease and

7  possibly weight loss, may violate Eighth Amendment).  Here, plaintiff was suffering from a

8  virus, and plaintiff adduces no evidence demonstrating that earlier intervention would have

9  resolved his symptoms of gastroenteritis.

10          Moreover, mere delay in treatment, without more, is insufficient to demonstrate

11  deliberate indifference.  Plaintiff avers that he might have died.  However, plaintiff's claim that

12  he might have died is speculative, particularly in light of the vital signs registered on plaintiff's

13  arrival at the B-1 clinic on July 4, 2007.  (Dkt. No. 65-2 at 11.)  Plaintiff's vitals were recorded as

14  97.6 degrees temperature, pulse rate of 86, respiration rate of 17, oxygen saturation rate of 97

15  percent, and blood pressure of 116/72.  (Id.)  All of these readings appear to be within normal

16  limits.  Plaintiff also weighed in at 170 pounds.  (Id.)  Thus, the physical examination of plaintiff

17  did not reveal he was on the verge of death, and none of the doctor's notes from the July 4, 2007

18  examination or monitoring during the IV fluids noted any such risk.  Plaintiff provided no

19  medical records demonstrating his weight prior to the instant illness.  Any speculation on

20  plaintiff's part as to possible future harm he might have suffered absent medical treatment is

21  insufficient to create a genuine issue of material fact.

22          In his reply to defendants' opposition to plaintiff's motion for summary judgment,

23  plaintiff cites the Merck Medical Manual, stating dehydration is a serious life-threatening

24  condition.  (Dkt. No. 76 at 4.)  Plaintiff also claims dysentery can be life-threatening if fluids

25  cannot be replenished in the body, and that these two conditions are exacerbated by high heat as

26  encountered by plaintiff from July 1 to 4, 2007.  (Id.)

1   While plaintiff strenuously argues that his condition was life-threatening, the court

2   assesses whether plaintiff's condition during the time he went without medical treatment

3   constituted a serious medical need.  As noted above, plaintiff was not subjected to high heat until

4   July 4, 2007, the day he was treated at the medical clinic.  The undisputed documentary evidence

5   demonstrates that plaintiff was initially diagnosed with viral gastroenteritis on July 4, 2007 (dkt.

6   no. 65-2 at 12), and shortly thereafter, dehydration and gastroenteritis (dkt. no. 65-2 at 13).

7   Contrary to plaintiff's hyperbole, the doctor did not assess either diagnosis as "acute," or

8   "serious," or "severe."  (Id.)   The doctor did not find that "plaintiff's body was shutting down"

9   (dkt. no. 65 at 19) or that "plaintiff suffered a near-fatal catastrophe" (dkt. no. 76 at 2).  Plaintiff

10  was not diagnosed with dysentery.  (Dkt. No. 65-2.)  The July 4, 2007 doctor's notes do not

11  reflect that the gastroenteritis "caused a massive infliction of pain and suffering" (dkt. no. 76 at 4,

12  citing dkt. no. 65-2), or was caused by "severe heat stress" (dkt. no. 65 at 11).

13  The Merck Manual defines Gastroenteritis as:

14  inflammation of the lining of the stomach and small and large
    intestines. . . .  Treatment is symptomatic. . . .  Gastroenteritis is
15  usually uncomfortable but self-limited.  Electrolyte and fluid loss is
    usually little more than an inconvenience to an otherwise healthy
16  adult but can be grave for people who are very young . . ., elderly,
    or debilitated or who have serious concomitant illnesses.

17

18  The Merck Manual for Health Care Professionals, merckmanuals.com (2010-2011),

19  http://www.merckmanuals.com/professional/index.html (last visited January 26, 2012).  The

20  Merck Manual sets forth a separate entry for gastroenteritis and dehydration, which directs the

21  reader to the treatment section under gastroenteritis which provides:

22  •   Oral or IV rehydration

23  •   Consideration of antidiarrheal agents if [certain] infection is not suspected

24  •   Antibiotics only in select cases

25  Supportive treatment is all that is needed for most patients.  Bed
    rest with convenient access to a toilet or bedpan is desirable.

26

24

Id.  Plaintiff provides no evidence demonstrating that he is very young, elderly, debilitated, or was diagnosed with a concomitant serious illness, and the medical records for his July 4, 2007 treatment do not reflect these risk factors.  It is undisputed that plaintiff had access to a toilet, a bed, and running water throughout the relevant time frame.  Because the Merck Manual states that "[s]upportive treatment is all that is needed for most patients," and plaintiff has provided no medical evidence to the contrary, defendant Esberto was not deliberately indifferent by failing to provide earlier treatment.  Thus, defendant Esberto is also entitled to summary judgment.

### iv.  Delay

Plaintiff fails to adduce evidence that earlier presentation at the clinic would have changed the outcome here.  Indeed, plaintiff states he continued to suffer from the condition even after he received medical treatment.  (Dkt. No. 65-1 at 10.)  At bottom, it appears plaintiff suffered from an episode of gastroenteritis and, because it was viral, rather than bacterial, which could be treated by antibiotics, the virus had to run its course.

Accordingly, plaintiff fails to demonstrate that he was seriously harmed by the delay.  See McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir.1992); see also Hallett v. Morgan, 287 F.3d 1193, 1206 (9th Cir. 2002) (The Eighth Amendment is only violated if "delays occurred to a patient with problems so severe that delays would cause significant harm that defendants should have known. . . .")  Clearly it is miserable to suffer gastroenteritis in a prison cell.  The prisoner cannot obtain over the counter remedies to address diarrhea or vomiting.  However, plaintiff adduces no evidence demonstrating that the delayed treatment for gastroenteritis caused him significant future harm.  While plaintiff was treated with intravenous fluids for dehydration, it was for a period of a little over two hours, and plaintiff did not require admission to a hospital.  Plaintiff was released to his cell at 2:35 p.m., with orders to push liquids, eat a clear liquid diet for 24 hours, and to graduate to a regular diet as tolerated.

The infliction of pain may constitute an Eighth Amendment violation even if a delay in treatment does not impact further treatment.  McGuckin, 974 F.2d at 1060; Gutierrez v.

1  <u>Peters</u>, 111 F.3d 1364, 1372 (7th Cir. 1997) ("delays in treating painful medical conditions that

2  are not life-threatening can support Eighth Amendment claims"); <u>Brown v. Hughes</u>, 894 F.2d

3  1533 (11th Cir. 1990) (six hour delay in treating painful broken foot states an Eighth Amendment

4  claim).  The needless suffering of pain may be sufficient to demonstrate further harm.  <u>Clement</u>

5  <u>v. Gomez</u>, 298 F.3d 898, 904 (9th Cir. 2002) (prison officials may have been deliberately

6  indifferent to prisoners' serious medical needs if officials aware of harmful effects of pepper

7  spray and inadequacy of ventilation and yet purposefully refused showers and medical attention

8  to prisoners over four hour period).  Without downplaying the pain that plaintiff may have

9  suffered, the court cannot find that the, at most, three day delay in treatment – a period of time a

10  reasonable person might wait to seek medical treatment for a virus causing flu-like symptoms –

11  was sufficiently long that it requires a jury's resolution of plaintiff's Eighth Amendment claim.

12       While plaintiff is correct that a prolonged episode of gastroenteritis and

13  dehydration could possibly put his life at risk, plaintiff presents no competent evidence that a one

14  day, or a three day, delay in treatment put his life at risk.  Indeed, the medical records

15  demonstrate that plaintiff's life was not at risk, and he was treated in the clinic with IV fluids for

16  a little over two hours, and then released to his cell in stable condition.  Plaintiff adduces no

17  evidence that he suffered significant harm based on the alleged delay in treatment.

18       For all of the above reasons, plaintiff fails to demonstrate that the delay in

19  obtaining medical care violated his Eighth Amendment rights.  Taking plaintiff's allegations as

20  true, no reasonable jury could find that defendants violated plaintiff's Eighth Amendment rights.

21       3.  <u>Conclusion:  Medical Care Claim</u>

22       In light of the above, defendants' cross-motion for summary judgment should be

23  granted, and plaintiff's motion for summary judgment should be denied.

24  VIII.  <u>Qualified Immunity</u>

25       Because the court has found that the conduct alleged by plaintiff does not state a

26  constitutional deprivation, the court need not address defendants' arguments for qualified

1   immunity.

2          IT IS HEREBY RECOMMENDED that:

3          1.  Defendants' August 4, 2011 cross-motion for summary judgment (dkt. no. 58)

4   be granted as to defendants Echeverria, Lyons and Esberto; and

5          2.  Plaintiff's July 20, 2011 motion for summary judgment (dkt. no. 54), be

6   denied.

7          These findings and recommendations are submitted to the United States District

8   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

9   days after being served with these findings and recommendations, any party may file written

10  objections with the court and serve a copy on all parties.  Such a document should be captioned

11  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

12  objections shall be filed and served within fourteen days after service of the objections.  The

13  parties are advised that failure to file objections within the specified time may waive the right to

14  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

15  DATED:  February 2, 2012

16

17                                      KENDALL J. NEWMAN

18                                      UNITED STATES MAGISTRATE JUDGE

19  heil2721.msj

20

21

22

23

24

25

26