1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   THOMAS JOHN HEILMAN,

11            Plaintiff,                    No. 2:09-cv-2721 JAM KJN P

12        vs.

13   T. LYONS, et al.,                     FINDINGS AND RECOMMENDATIONS

14            Defendants,

15   _____/

16   I.  Introduction

17        Plaintiff, a state prisoner proceeding without counsel, seeks relief pursuant to 42 U.S.C.

18   § 1983.  Pending before the court is the motion for summary judgment filed by defendants Lyons,

19   Echevarria, Esberto, and Sheldon (hereafter "defendants").  (ECF No. 111.)  Plaintiff filed an

20   opposition on January 25, 2013.  (ECF No 118.)  Defendants filed a reply on March 1, 2013.

21   (ECF No. 120.)  As set forth below, this court recommends that defendants' motion for summary

22   judgment be granted.

23   II.  Background

24        The pending motion for summary judgment is the third motion for summary judgment

25   filed in this case.  On August 4, 2011, defendants Lyons, Echevarria and Esberto filed a motion

26   for summary judgment.  (ECF No. 58.)  On August 31, 2011, plaintiff filed an opposition (ECF

No. 65).  On June 15, 2012, the February 3, 2012 motion for summary judgment was granted.

(ECF No. 103.)  On July 27, 2013, defendant Sheldon filed a motion for summary judgment.

(ECF No. 106.)

Before plaintiff's opposition to defendant Sheldon's motion was due, the district court

granted plaintiff an opportunity to re-open the first motion for summary judgment based on

Woods v. Carey, 684 F.3d 934, 935 (9th Cir. 2012).  (ECF No. 107.)  Plaintiff elected to re-open

the motion on September 10, 2012.  (ECF No. 109.)  On October 10, 2012, the district court

vacated the order granting defendants' motion for summary judgment, and denied the two

motions for summary judgment without prejudice to renewal.  (ECF No. 110.)

All defendants renewed their motion for summary judgment on November 8, 2012.  (ECF

No. 111.)  On February 22, 2013, plaintiff filed an opposition to defendants' statement of facts

(ECF No. 119), and a ten page opposition to defendants' motion (ECF No. 118).  Despite the

renewal of the motion in light of Woods, plaintiff filed no new evidence in support of his claims,

other than his opposition which he signed under penalty of perjury.  (ECF Nos. 118, 119.)

Moreover, much of plaintiff's opposition was spent reciting plaintiff's efforts to obtain discovery

that would allegedly identify inmate witnesses.  (ECF No. 118 at 4-8.)[1]  Finally, defendants

incorporated their briefing and evidence submitted in connection with their prior motions.

Accordingly, in an abundance of caution, the court has considered plaintiff's prior opposition,

and his briefing in support of his July 20, 2011 motion for summary judgment (ECF Nos. 55, 76),

as well as defendants' prior motions and replies in addressing plaintiff's claims.

////

---

[1]  The court will not recite the history of discovery disputes resolved in the instant action.
However, the court notes that the first discovery order issued in this case on October 28, 2010.
(ECF No. 16.)  The court's rulings pertaining to plaintiff's discovery requests for witnesses were
issued on July 26, 2011 (ECF No. 56), September 21, 2011 (ECF No. 70), February 8, 2012
(ECF No. 83), and January 30, 2013 (ECF No. 117).  In any event, resolution of the instant
motion for summary judgment does not turn on plaintiff's failure to provide declarations from
inmate witnesses.

III.  <u>Allegations</u>

This case is proceeding on the original verified complaint, filed September 30, 2009. (ECF No. 1.)  Plaintiff alleges that defendants were deliberately indifferent to his serious medical needs because they denied and delayed him access to medical treatment.  (<u>Id.</u>)  Plaintiff's complaint contains the following allegations:

Plaintiff alleges that on the night of June 30, 2007, while housed in administrative segregation ("ad seg") at California Medical Facility in Vacaville ("CMF"), after eating the evening meal, plaintiff began to feel nauseous.  On July 1, 2007, at breakfast, plaintiff ate a small amount of food, and began to vomit. Plaintiff's condition worsened throughout the day, and included severe stomach pain, cramping, nausea and diarrhea, intense headaches, dizziness, chills, hot and cold flashes and uncontrollable vomiting.  (ECF No. 1 at 7.)  Plaintiff informed the ad seg correctional officers that plaintiff contracted a food borne illness and requested to see the duty nurse; plaintiff was told that no one was on duty.  No one checked on plaintiff's well-being in ad seg that day, despite allegedly high temperatures (100 degrees outside; 90 degrees inside cell).  (<u>Id.</u> at 10.)

On July 2, 2007, plaintiff told defendant Echevarria that plaintiff was vomiting all night with explosive diarrhea, could barely get out of bed, could not eat, did not want breakfast or lunch, and needed to see a nurse and get medical attention.  Plaintiff alleges Echevarria closed the food tray slot but failed to summon the nurse or arrange medical care.  Plaintiff could not hold down liquids that day.  No one checked on plaintiff on July 2, 2007, despite high temperatures.

From July 2, 2007 to July 3, 2007, defendant Lyons worked the first watch shift at ad seg.  Around 2:00 a.m. on July 3, 2007, plaintiff's illness became worse, including severe head pain and explosive diarrhea.  Plaintiff began having dry heaves, which plaintiff claims caused him to black out and lose consciousness. When plaintiff came to, he was on the cell floor, had soiled himself with diarrhea, and called "man down" to defendant Lyons, who found plaintiff sitting on the floor by the toilet.  (<u>Id.</u> at 9.)  Plaintiff told Lyons what happened, and Lyons left, stating she was informing the ad seg First Watch Sergeant John Doe #1.[2] However, upon return, Lyons allegedly told plaintiff that Lyons and Doe decided plaintiff did not require emergency medical care, and that John Doe #1 told Lyons there was no doctor or nurse

---

[2]  During this action, plaintiff identified John Doe #1 as Sergeant Derrall Sheldon, and by order filed August 30, 2011, the court ordered service of process on defendant Sheldon.

1    available, and no officer could be taken off assigned to duties to escort and stay with plaintiff in the B-1 medical clinic.

2

3    Plaintiff removed his soiled boxers and placed them in a brown paper bag. Plaintiff wrapped himself in a sheet, suffering from hot and cold chills, and was still unable to drink fluids. Correctional

4    Officer Ramirez, working ad seg breakfast, noticed plaintiff in distress, and informed defendant Esberto, R.N., of plaintiff's

5    emergency medical need. Plaintiff told Esberto plaintiff had been extremely sick for the past two days, with constant diarrhea,

6    inability to eat or drink, and a loss of consciousness the prior evening. Plaintiff alleges he told Esberto that plaintiff believed he

7    contracted a food-borne illness because of the unsanitary conditions in ad seg. Plaintiff alleges Esberto at some unidentified

8    time put plaintiff's soiled boxers in a pink bio-hazard bag. Esberto did not summon emergency medical help, but instead removed

9    plaintiff from his cell, hand-cuffed, and put plaintiff in a small wire mesh cage where plaintiff was confronted by 6 or 7 other ad seg

10   staff to determine plaintiff's mental stability. (Id. at 11.) Plaintiff alleges he was confronted because Esberto "falsely and mistakenly

11   told these professionals that plaintiff was not eating because 'he was on a hunger strike' as a pretext." (Id.) Plaintiff received no

12   medical attention on July 3, 2007.

13   On July 4, 2007, Officer Ramirez again informed defendant Esberto of plaintiff's medical condition. At this point, plaintiff

14   claims he was unable to get out of bed and "seemed to be in a semi-conscious state." (Id. at 11.) Esberto had plaintiff taken to

15   the B-1 emergency medical clinic where plaintiff could barely stand or talk, severely dehydrated, and was prescribed anti-

16   nausea/anti-diarrhea medication. (Id. at 12.) Plaintiff was admitted to the clinic where he received IV fluids for most of the

17   afternoon. Plaintiff was diagnosed with severe dehydration brought on by "an unknown stomach virus or other ailment." (Id.)

18   Plaintiff contends there was an outbreak of the Norovirus throughout California Department of Corrections and

19   Rehabilitation ("CDCR") prisons in the summer of 2007, yet plaintiff was not tested for this virus. Plaintiff alleges defendants

20   violated the Eighth Amendment because they were deliberately indifferent to plaintiff's serious medical needs, abused their power

21   of authority by making unauthorized and unqualified decisions concerning plaintiff's need for medical care, and despite high

22   temperatures, and plaintiff being on psychotropic or other medications from July 1, 2007, through July 4, 2007, no one

23   offered plaintiff cold liquids or access to cold showers, and no health care personnel checked on plaintiff's well-being on July 1 or

24   2, 2007, in violation of the Remedial Health Plan (id. at 14), established under Coleman v. Wilson, 912 F.Supp. 1282 (9th Cir.

25   1995).

26   (ECF No. 1.)

4

On March 22, 2010, the court found that plaintiff states two cognizable claims for relief: (1) deliberate indifference to a serious medical need;[3] and (2) unconstitutional conditions of excessive heat, both in violation of the Eighth Amendment.  (ECF No. 6 at 2.)

IV.  Legal Standard for Summary Judgment

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil procedure 56(c) is met.  "The judgment sought should be rendered  if . . . there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party
> always bears the initial responsibility of informing the district court
> of the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions
> on file, together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id., citing Fed. R. Civ. P. 56(c).  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.  In such a circumstance, summary judgment should be granted, "so long

////

---

[3]  To the extent that plaintiff alleges in Claim 2 that defendants violated prison regulations or policies by making medical decisions, defendants are entitled to summary judgment as such claims are not cognizable.  There is no private right of action under § 1983 for a violation of Title 15 regulations.  Sweaney v. Ada County, Idaho, 119 F.3d 1385, 1391 (9th Cir. 1997); see also ECF No. 6 at 2.

1    as whatever is before the district court demonstrates that the standard for entry of summary

2    judgment, as set forth in Rule 56(c), is satisfied." Id.

3         If the moving party meets its initial responsibility, the burden then shifts to the opposing

4    party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec.

5    Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the

6    existence of such a factual dispute, the opposing party may not rely upon the allegations or

7    denials of its pleadings, but is required to tender evidence of specific facts in the form of

8    affidavits, and/or admissible discovery material in support of its contention that the dispute

9    exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must

10   demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the

11   suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

12   T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and

13   that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict

14   for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir.

15   1987).

16        In the endeavor to establish the existence of a factual dispute, the opposing party need not

17   establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual

18   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

19   trial." T.W. Elec. Serv., 809 F.2d at 630. Thus, the "purpose of summary judgment is to 'pierce

20   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

21   Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

22   amendments).

23        In resolving a summary judgment motion, the court examines the pleadings, depositions,

24   answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R.

25   Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at

26   255. All reasonable inferences that may be drawn from the facts placed before the court must be

drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

On November 8, 2012, defendants contemporaneously provided plaintiff notice of the requirements for opposing a motion for summary judgment brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (ECF No. 112); see Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

V.  Facts

For purposes of summary judgment, the court finds that the following facts are either not disputed, or, following the court's review of the evidence submitted, are deemed undisputed, unless otherwise indicated:

1.  At all relevant times, plaintiff was incarcerated at CMF.

2.  At all relevant times, defendants were employed by the CDCR.

3.  Defendants Lyons and Echevarria worked as correctional officers, defendant Sheldon worked as a correctional sergeant, and defendant Esberto, a Registered Nurse, worked as a correctional nurse.

4.  At all relevant times, defendants were assigned to CMF I-3 ad seg wing.

5.  Plaintiff alleges he contracted a "food borne illness" on or about June 30, 2007.

6.  On July 1, 2007, and July 2, 2007, defendant Echevarria was on duty at CMF from 7:00 a.m. to 3:00 p.m.

////

7.  Plaintiff alleges that he informed ad seg correctional officers, including defendant Echevarria, on July 1, 2007, that plaintiff contracted a food borne illness from the night before, requested medical assistance, and was told there was no nurse on duty.  Defendants dispute this allegation; defendants contend plaintiff did not appear to be subject to a medical emergency, and did not request medical care on July 1, 2007, and that a nurse is assigned to each wing.

8.  Plaintiff alleges he spoke to defendant Echevarria on July 2, 2007, and requested medical attention.  Plaintiff contends he described his symptoms, and that defendant Echevarria responded by closing the food tray slot and leaving.  (ECF No. 119 at 6.)  Defendant Echevarria did not summon emergency medical assistance.  Defendant Echevarria disputes these allegations, declaring he does not recall plaintiff asking for medical care on July 2, 2007.  (ECF No. 58-3 at 3.)

9.  According to the ad seg unit Log Book, breakfast and lunch were passed out at 0620, prior to defendant Echevarria's shift.  (ECF No. 58-3 at 6.)

10.  Defendant Echevarria did not distribute meals to the ad seg unit on the morning of July 2, 2007.  (ECF No. 58-3 at 3.)

11.  Daily activity records indicate that meals were served to plaintiff on July 2, 2007, without refusal.  Plaintiff disputes this fact, claiming different staff members do not always keep the Log Book records "correct and documented."  (ECF No. 65-1 at 7.)

12.  Defendant Echevarria does not recall plaintiff appearing ill on July 2, 2007.  (ECF No. 58-3 at 3.)  Plaintiff disputes this fact, claiming plaintiff informed defendant Echevarria of plaintiff's illness.  (ECF No. 119 at 6.)

13.  The Log Book records do not show any complaint made by plaintiff during defendant Echevarria's watch on July 2, 2007.  (ECF No. 58-3 at 6-7.)  Plaintiff disputes this fact, for the same reason stated in No. 11.

14.  On July 2, 2007, staff marked off plaintiff as having completed a shower under the "Record of Daily Activity."  (ECF No. 58-3 at 9.)

15. Defendant Echevarria was not on duty on July 3, 2007, or July 4, 2007.

16. Defendant Echevarria has undergone institutional training to recognize signs of heat-related illness.

17. On July 2, 2007, defendant Lyons was assigned first and third watch at CMF.

18. On July 3, 2007, defendant Lyons was assigned first watch at CMF.

19. Defendant Lyons' duties as a correctional officer included half-hour security checks.

20. At approximately half-hour intervals, prison staff in the I-3 ad seg wing at CMF are to document the institutional security checks and inmate activities in a handwritten "Log Book." Plaintiff contends that different staff members do not always document inmate activities as required by CDCR procedures.[4]

21. CDCR procedures provide that if an inmate suffers a medical emergency, staff are to enter the time and circumstances in the Log Book.

22. On or about 2:00 a.m.[5] on July 3, 2007, plaintiff advised defendant Lyons of plaintiff's physical distress, including his stomach ailment. Plaintiff contends he called out "man down," but defendant Lyons has no recollection of plaintiff calling "man down." The subsequent verbal exchange between plaintiff and defendant Lyons is disputed. Plaintiff contends he told defendant Lyons that plaintiff needed emergency medical care because plaintiff had lost consciousness and had a dysentery-like condition. Plaintiff also contends that defendant Lyons failed to document plaintiff's request for emergency medical assistance on any I-3 ad seg Log Book or in plaintiff's personal detention record. Plaintiff alleges that defendant Lyons did not consider plaintiff's condition to be an emergency. (ECF No. 119 at 8.)

23. Plaintiff alleges that defendant Lyons did not consider his condition an emergency. Plaintiff further contends that defendant Lyons refused to provide emergency medical care

---

[4] Plaintiff now contends that "defendant Lyons never conducted 1/2 hour security checks as this is unheard of," citing "unavailable inmate declarations." (ECF No. 119 at 7.)

[5] Plaintiff claims it was around 2:00 a.m.; defendant Lyons claims it was 2:30 a.m.

because in the opinion of Lyons' and her supervisor, defendant Sheldon, plaintiff's request for medical care and treatment was unwarranted.

24.  On July 3, 2007, defendant Lyons contacted B-1 nurse in response to plaintiff's complaint.  (ECF No. 119 at 8.)

25.  On July 3, 2007, defendant Lyons notified her superior, defendant Sheldon, of plaintiff's complaints.[6]  (ECF No. 119 at 8.)

26.  Defendant Sheldon was on duty at CMF on or about July 3, 2007.

27.  Defendant Sheldon supervised defendant Lyons at CMF on July 3, 2007.

28.  Defendant Sheldon avers that during first watch on or about July 3, 2007, defendant Lyons contacted defendant Sheldon, informing him that plaintiff complained of a stomach ailment, but that plaintiff was talking and breathing fine.  (ECF No. 106-2 at 3.)  Defendant Sheldon stated that "[i]t was not indicated that [plaintiff] was in need of urgent medical attention," and "[i]t was determined that [plaintiff] could wait to be seen by the medical staff during normal triage hours in the morning, if his stomach still bothered him."  (ECF No. 106-2 at 3.)  Based on this conversation, defendant Sheldon "did not believe that [plaintiff] was in need of urgent medical care."  (Id.)[7]

29.  Defendant Sheldon did not physically observe plaintiff on July 3, 2007.

////

---

[6]  Plaintiff disputes the language used as to what defendant Lyons told her supervisor regarding plaintiff's complaints.  However, plaintiff was not privy to this conversation, and presents no contrary evidence, other than plaintiff's speculation as to what Lyons told her supervisor.

[7]  As set forth in footnote 6, plaintiff disputes defendant Sheldon's testimony (ECF No. 119 at 10); however, plaintiff was not present during this phone conversation, and provides no declarations from other percipient witnesses to the contrary.  Plaintiff now cites to 'unavailable inmate declarations" as evidence in support of his denial, but plaintiff alleges no facts suggesting an inmate witnessed this conversation.  Plaintiff admits that "both Lyons and Sheldon allege [plaintiff] was not seriously in need of medical care" (ECF No. 119 at 10), but denies that Lyons and Sheldon did not believe that plaintiff was in need of urgent medical care (ECF 119 at 11), again citing "unavailable inmate declarations."  (Id.)

30.  Defendant Lyons noted in the Log Book that plaintiff appeared to be talking and

breathing fine.[8]

31.  Later that morning, defendant Lyons noted in the Log Book that she observed

plaintiff to be sleeping.[9]

32.  Plaintiff's complaint and the staff observations were noted in the ad seg Log Book.[10]

Plaintiff disputes this, claiming that defendant Lyons only recorded "a self-serving account" of

what happened, rather than the symptoms plaintiff relayed (ECF No. 65-1 at 6), based on

"subjective observations," and that some of defendant Lyons' allegations would be refuted by

"unavailable inmate declarations."  (ECF No. 119 at 8.)

33.  Daily activity records indicate plaintiff refused breakfast and lunch on July 3, 2007.

(ECF No. 65-2 at 31.)

34.  Defendant Lyons' shift ended at 6:00 a.m. on July 3, 2007.  However, plaintiff claims

that his further calls for medical assistance between 2:00 a.m. and 6:00 a.m. were ignored by

---

[8]  Plaintiff disputes this fact by stating he "requested medical care at intervals throughout defendant Lyons' first watch shift."  (ECF No. 65-1 at 5.)  Plaintiff now denies that he was talking and breathing fine, citing "unavailable inmate declarations."  (ECF No. 119 at 8.)

[9]  Plaintiff disputes this fact; he claims he was severely ill and requested medical assistance by pleading with defendant Lyons throughout her first watch shift.  (ECF No. 65-1 at 6.)  Plaintiff contends defendant Lyons refused to summon emergency medical assistance.  (Id.)  Plaintiff now disputes this fact, citing "unavailable inmate declarations."  (ECF No. 119 at 8.)

[10]  The Log Book entry for July 3, 2007, states:

> [Plaintiff] advised me his stomach hurt and he had diarrhea.  I called B1 nurse [who] says to ask him if he can wait until 7 a.m. when triage opens, or does he need to be assessed now.  [Plaintiff] doesn't understand why Dr. not here now.  Sgt. notified.  [Plaintiff] lying on bed talking and breathing fine.

> 0300 . . . note [plaintiff] says it's not an ER[,] he will wait for triage.  If he can't[,] he will let me know.

> 0330 . . . [plaintiff] sleep.

(ECF No. 58-2 at 5.)

defendant Lyons.  (ECF No. 65-2 at 6.)  Plaintiff states that his claims would be corroborated by

unavailable inmate witness statements.  (Id.)

35.  Defendant Esberto was on duty at CMF on July 3, 2007, and July 4, 2007.

36.  Defendant Esberto's normal shift was 7:30 a.m. to 3:30 p.m.[11]

37.  Defendant Esberto's responsibilities in CMF's ad seg unit included examining

inmates as necessary, and documenting such examinations.

38.  Defendant Esberto has no recollection of receiving a request for a medical

examination of plaintiff on July 3, 2007, but if a medical exam had occurred, Esberto declared it

would be documented in plaintiff's medical files.[12]  Plaintiff contends that on July 3, 2007, he

told Esberto that plaintiff had been "extremely sick" for two days, with "constant diarrhea," and

that plaintiff was not able to eat or drink.  (ECF No. 55 at 10.)  Plaintiff contends that Esberto

had plaintiff removed from his cell and reviewed by the ad seg Interdisciplinary Treatment Team

("IDTT") rather than provide plaintiff medical treatment.  (Id. at 11.)  Plaintiff claims Esberto

told mental health staff and custody officers that plaintiff was not sick, but was staging a hunger

strike.[13]  (Id. at 10.)  The Log Book entry for July 3, 2007, notes that at 0915 an IDTT was "in

progress" for plaintiff and another inmate.  (ECF No. 58-2 at 6.)

39.  There is no documentation of a medical examination of plaintiff on July 3, 2007.[14]

_____

[11]  Plaintiff denies this fact, but does not cite evidence in support of such denial.

[12]  Plaintiff confirms that Esberto did not receive a written request, but claims Officer
Ramirez verbally informed Esberto that plaintiff had a medical emergency.  (ECF No. 65-1 at 9.)
However, plaintiff does not state he was present during this alleged exchange between Ramirez
and Esberto, and provides no declaration from Officer Ramirez confirming what Officer Ramirez
told Esberto.

[13]  Plaintiff provides no declarations from mental health or custody staff confirming this
took place, or that Esberto claimed plaintiff was staging a hunger strike.  Similarly none of the
documents submitted by plaintiff include a notation that plaintiff was on a hunger strike.  (ECF
No. 55 at 15-22; 65-2 at 1-49.)

[14]  Plaintiff does not dispute that there is no such documentation, but claims that
defendant Esberto did not document plaintiff's request in order to conceal defendant Esberto's
alleged refusal to provide medical care on July 3, 2007.  (ECF No. 65-1 at 9.)  Plaintiff claims

1    40.  Defendant Esberto saw plaintiff on July 4, 2007.

2    41.  On July 4, 2007, at 10:00 a.m., plaintiff was seen and treated with IV fluids in the

3    prison medical clinic.  (ECF Nos. 58-4; 110 at 4.)

4    42.  On July 4, 2007, on the health care service request form, defendant Esberto recorded

5    plaintiff's complaints as follows:

6           Inmate claims he has not been eating for four days now because he
            has bug in his stomach due to staff are touching his foods.  C/O
7           nausea and vomiting and headache.  Last diarrhea @ 0900.

8    (ECF No. 58-4 at 7.)  Plaintiff contends this understates plaintiff's conversation with defendant

9    Esberto.  (ECF No. 65-1 at 10.)  Plaintiff argues he was suffering from severe dehydration,

10   mental confusion, dizziness, and lethargy, and that defendant Esberto observed plaintiff's

11   condition to be serious.  (Id.)  In his verified complaint, plaintiff claimed he suffered from a food-

12   borne or other gastrointestinal illness.  (ECF No. 1 at 11, 15.)

13   43.  The medical record from the July 4, 2007 examination reflects an initial diagnosis of

14   gastroenteritis (viral) at 12:20 p.m., and a diagnosis of gastroenteritis and dehydration at 12:36

15   p.m.  (ECF No. 65-2 at 12-14.)  After receiving IV fluids, plaintiff was released to his cell, from

16   the clinic, at 2:35 p.m. on July 4, 2007, in stable condition.[15]  Plaintiff was directed to push

17   fluids, and prescribed Phenergan for nausea, Immodium for diarrhea, and a liquid diet.  (ECF No.

18   65-2 at 12.)

19   ////

20

21   that defendant Esberto attended a mental health evaluation of plaintiff on July 3, 2007, and states
     that defendant Esberto claimed "plaintiff's health and medical needs did not exist as plaintiff was
22   on a hunger strike."  (ECF No. 65-1 at 9.)  Plaintiff claims that defendant Esberto's "medical
     notes have disappeared."  (Id.)  Plaintiff cites to the inmate segregation record, which states only
23   that plaintiff was seen by IDTT on July 3, 2007.  (ECF No. 65-2 at 31.)  Plaintiff now claims that
     his evidence in support of this claim are "unavailable inmate declarations."  (ECF No. 119 at 9.)
24

25         [15]  In his opposition, plaintiff denied he was treated with fluids and released back to his
     cell in stable condition, and cites as evidence "medical notes of plaintiff - July 4, 2007."  (ECF
26   No. 119 at 10.)  However, plaintiff is not a doctor or medical professional, and provided no
     medical expert opinion as to his condition upon release.

13

44.  Daily activity records indicate plaintiff refused breakfast and lunch on July 4, 2007. (ECF No. 65-2 at 31.)

45.  During plaintiff's illness, plaintiff had access to drinking water in his cell.

46.  Plaintiff alleges he received no medical attention from the defendants from July 1 through 3, 2007.

47.  Plaintiff lost weight during his stomach illness,[16] and alleges he could have died because of the alleged delay in care.

48.  Plaintiff contends that after his return to his cell, after treatment on July 4, 2007, plaintiff continued to suffer from this illness.  (ECF No. 65-1 at 10.)

49.  Defendants Echevarria and Lyons have had no formal training as a physician, nurse or emergency medical training.

50.  Defendants Echevarria, Lyons, and Sheldon have undergone training to recognize signs of heat-related illness, during the course of their CDCR employment, and have participated in medical response training for correctional officers as required by CDCR.

51.  Plaintiff alleges that the outside temperature from July 1 - 4, 2007, "reached 100 degrees," and the temperature inside his ad seg cell was "over 90 degrees."  (ECF No. 1 at 13-14.)

VI.  Eighth Amendment Claims

A.  Conditions of Confinement:  Claim of Excessive Heat

In his third claim, plaintiff alleges he was subjected to excessive heat, and that defendants failed to comply with a Remedial Heat Plan protocol.

---

[16]  On July 4, 2007, plaintiff's weight was recorded as 170.  (ECF No. 65-2 at 11.)  In the verified complaint, plaintiff claimed he lost 15-20 pounds from June 30, 2007 to July 4, 2007. (ECF No. 1 at 8.)  The February 26, 2008 Director's Level Appeal Decision recounted plaintiff's claim that "his weight went from 180 to 170 pounds," and recounted that the second level reviewer noted plaintiff's weight was 179 pounds on July 4, 2007, and 186 pounds on September 20, 2007.  (ECF No. 65-2 at 48.)  However, plaintiff provided no medical evidence confirming his weight before June 30, 2007.

1        1.  Legal Standards

2        The Eighth Amendment proscribes conditions of confinement constituting cruel and

3   unusual punishment.  The Eighth Amendment's prohibition against cruel and unusual

4   punishment imposes duties on prison officials to "provide humane conditions of confinement."

5   Farmer v. Brennan, 511 U.S. 825, 832 (1994).  To establish a violation of the Eighth

6   Amendment, a prisoner must show that he was, objectively, deprived of something "sufficiently

7   serious."  Id. at 834.  A deprivation is sufficiently serious when the prison official's act or

8   omission results "in the denial of 'the minimal civilized measure of life's necessities.'"  Id.,

9   quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  Next, the prisoner must show that the

10  deprivation occurred as a result of deliberate indifference to the inmate's health or safety; this

11  determination is premised on an assessment of the prison official's subjective state of mind.  Id.,

12  citing Wilson v. Seiter, 501 U.S. 294, 302-03 (1991).

13        Thus, the prisoner must show not only that prison officials were subjectively and actually

14  indifferent to the plight he alleges, but also that the conditions themselves were objectively

15  sufficiently serious to acquire constitutional dimension; that is, the conditions "must result in the

16  denial of the minimal civilized measure of life's necessities."  Farmer, 511 U.S. at 834 (quoting

17  Rhodes, 452 U.S. at 347).

18        Generally, only the most severe deprivations can support an Eighth Amendment claim.

19  However, "[m]ore modest deprivations can also form the objective basis of a violation, but only

20  if such deprivations are lengthy or ongoing."  See Johnson v. Lewis, 217 F.3d 726, 732 (9th Cir.

21  2000) (receipt of inedible food, inadequate drinking water, and inadequate access to toilets for

22  four days constitutes sufficiently serious deprivation).  "To find an Eighth Amendment violation,

23  courts must identify specific conditions that fail to meet Eighth Amendment requirements."

24  Hoptowit, 682 F.2d at 1247; see also id. n.3.  A "totality of circumstances" test is not to be

25  applied.  Id. at 1247.

26  ////

2.  <u>Analysis</u>

Plaintiff claims that defendants were deliberately indifferent to conditions of excessive heat exposure from July 1 to 4, 2007.  Plaintiff alleges outside temperatures were 100 degrees, and that indoor temperatures were 90 degrees.  (ECF No. 1 at 10.)  However, plaintiff provides no evidence documenting these temperatures.  Plaintiff did provide a copy of a document entitled "Patient Education for Heat Plan," but the form contains no date, and although it provides signature lines for a patient and staff, no signature is on the form, and the form makes no reference to plaintiff or to CMF.  (ECF No. 65-2 at 35.)  In his reply, plaintiff states that CMF "established its own Remedial Heat Plan."  (ECF No. 76 at 5.)  However, plaintiff provides no citation to, nor copy of, the Remedial Heat Plan in effect at CMF during the relevant time frame.[17]  In his verified complaint, plaintiff alleges he "was on psychotropic or other medications" (ECF No. 1 at 14), and in his opposition claims he was prescribed psych medication (ECF No. 65 at 25) during the relevant period, but plaintiff provided no evidence demonstrating plaintiff was prescribed a medication specifically covered by a CMF Remedial Heat Plan during the relevant time frame.

Taking plaintiff's declaration that he was prescribed psychotropic medications during the relevant time frame as true, plaintiff fails to demonstrate that any CMF Remedial Heat Plan was violated, or that temperatures during the relevant time frame warranted implementation of the alleged Remedial Heat Plan.  Therefore, defendants are entitled to summary judgment on that basis.

However, even if the court accepts the Patient Education for Heat Plan as the applicable protocol for CMF during the relevant time frame, the result is the same.  Defendants ask the court

---

[17]  As noted by defendants, plaintiff relies heavily on the <u>Coleman v. Wilson</u> class action for his claim that he was to be treated in accordance with a mandatory protocol to prevent heat-related illness.  <u>Id.</u>, 912 F.Supp. 1282 (E.D. Cal. 1995).  Inmates confined at CMF were expressly exempted from the class certification in Coleman.  <u>Id.</u> at 1293.  Because plaintiff is not a member of the <u>Coleman</u> class, he is not bound by the <u>Coleman</u> judgment.

to take judicial notice of the historical weather records for zip code 95696.  Pursuant to Rule 201 of the Federal Rules of Evidence, defendants' request is granted.  See also Del Raine v. Williford, 32 F.3d 1024, 1036 n.4 (7th Cir. 1994) (noting with approval district court's order taking judicial notice of air temperatures of nearest airport for purposes of determining temperatures in the prison).  The following temperatures were recorded for zip code 95696, where CMF is located, during the relevant time periods:

       June 30, 2007 - maximum temperature 80.6 degrees

       July 1, 2007 - maximum temperature 82.4 degrees

       July 2, 2007 - maximum temperature 89.6 degrees

       July 3, 2007 - maximum temperature 92.4 degrees

       July 4, 2007 - maximum temperature 102.2 degrees

The Old Farmer's Almanac, almanac.com (2013), http://www.almanac.com/weather/history/ zipcode/95696 (last visited July 8, 2013).

The heat plan provided by plaintiff states that patients will remain indoors when the outdoor temperature reaches 90 degrees or greater, and that when indoor temperatures reach 85 degrees or greater, certain additional provisions come into effect.  (ECF 65-2 at 35.)  Here, plaintiff suggests that the inside temperature at the prison runs 10 degrees cooler than the outside temperature.  (ECF No. 1 at 10 [100 - 90 = 10].)  Taking plaintiff's temperature differential as true, the inside temperatures at the prison did not reach or exceed 85 degrees until July 4, 2007, the day plaintiff was seen at the medical clinic.  Therefore, under the heat plan provided by plaintiff, prison officials were not required to implement the heat plan protocol until July 4, 2007.

Moreover, the medical records do not indicate heat or heat stress played a role in plaintiff's illness.  Rather, plaintiff claims he became ill as the result of an airborne or gastrointestinal virus, and alleges his illness began on the evening of June 30, 2007, after the evening meal.  Although it would be cooler in the evening, the high temperature on June 30, 2007, was 80.6, not high enough to induce heat stress or heat-related illness.  Plaintiff does not

allege that he complained of heat issues to prison officials, and there is no mention of any heat-related complaints in the medical records provided.  Moreover, plaintiff fails to demonstrate he was subjected to continuous periods of excessive heat.  The increase in temperatures from June 30, 2007, to July 3, 2007, was fairly incremental, particularly from June 30 to July 1, and from July 2 to July 3, and the outside temperature did not hit triple digits until July 4, 2007, the day plaintiff received medical treatment.  These temperatures fail to demonstrate plaintiff was at substantial risk of serious harm, Farmer, 511 U.S. at 837, due to excessive heat conditions.

For all of the above reasons, plaintiff fails to demonstrate that a substantial risk of serious harm existed due to heat conditions, or that he was subjected to a lengthy or ongoing exposure to excessive heat.  Thus, plaintiff's third claim for relief should be denied.

### 3.  Conclusion:  Excessive Heat Claim

For all of the above reasons, defendants are entitled to summary judgment on plaintiff's third claim.

### B.  Eighth Amendment:  Medical Care Claim

In his first, and part of his second, claim for relief, plaintiff alleges defendants were deliberately indifferent to plaintiff's serious medical needs.

### 1.  Legal Standards - Medical Care

Generally, deliberate indifference to a serious medical need presents a cognizable claim for a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 104 (1976).  According to Farmer, "deliberate indifference" to a serious medical need exists "if [the prison official] knows that [the] inmate [ ] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  Id. 511 U.S. at 847.  The deliberate indifference standard "is less stringent in cases involving a prisoner's medical needs than in other cases involving harm to incarcerated individuals because 'the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'"  McGuckin v. Smith, 974 F.2d 1050,

1060 (9th Cir. 1992) (quoting Hudson v. McMillian, 503 U.S. 1, 6 (1992)), overruled on other

grounds by WMX Technologies, Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997).  Specifically, a

determination of "deliberate indifference" involves two elements:  (1) the seriousness of the

prisoner's medical needs; and (2) the nature of the defendant's responses to those needs.

McGuckin, 974 F.2d at 1059.

First, a "serious" medical need exists if the failure to treat a prisoner's condition could

result in further significant injury or the "unnecessary and wanton infliction of pain."  Id. (citing

Estelle, 429 U.S. at 104).  Examples of instances where a prisoner has a "serious" need for

medical attention include the existence of an injury that a reasonable doctor or patient would find

important and worthy of comment or treatment; the presence of a medical condition that

significantly affects an individual's daily activities; or the existence of chronic and substantial

pain.  McGuckin, 974 F.2d at 1059-60 (citing Wood v. Housewright, 900 F.2d 1332, 1337-41

(9th Cir. 1990)).

Second, the nature of a defendant's responses must be such that the defendant

purposefully ignores or fails to respond to a prisoner's pain or possible medical need in order for

"deliberate indifference" to be established.  McGuckin, 974 F.2d at 1060.  Deliberate

indifference may occur when prison officials deny, delay, or intentionally interfere with medical

treatment."  Hutchinson v. United States, 838 F.2d 390, 392 (9th Cir. 1988).  In order for

deliberate indifference to be established, there must first be a purposeful act or failure to act on

the part of the defendant and resulting harm.  See McGuckin, 974 F.2d at 1060.  "A defendant

must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order

for deliberate indifference to be established."  Id.  Second, there must be a resulting harm from

the defendant's activities.  Id.  The needless suffering of pain may be sufficient to demonstrate

further harm.  Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002).

Where the claim is based on a delay in treatment, "a prisoner can make 'no claim for

deliberate medical indifference unless the denial was harmful.'"  McGuckin at 1060 (quoting

1  Shapley v. Nevada Board of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985)(per

2  curiam)).  The harm caused by the delay need not, however, be "substantial."  McGuckin at 1060

3  (citing Wood, 900 F.2d at 1339-40; also citing Hudson, 503 U.S. at 5-10).  A showing of merely

4  inadvertent or even negligent medical care is not enough to establish a constitutional violation.

5  Estelle, 429 U.S. at 105-06; Frost v. Agnos, 152 F.3d 1124, 1130 (9th Cir. 1998).

6       In order to defeat defendants' motion for summary judgment, plaintiff must "produce at

7  least some significant probative evidence tending to [show]," T.W. Elec. Serv., 809 F.2d at 630,

8  that defendants' actions, or failures to act, were "in conscious disregard of an excessive risk to

9  plaintiff's health," Jackson v. McIntosh, 90 F.3d 330, 332 (1996) (citing Farmer, 511 U.S. at

10 837).

11       2.  Analysis

12            i.  Defendant Echevarria

13       Although the ad seg Log Book does not reflect this fact, and defendant Echevarria does

14 not recall, plaintiff alleges he advised defendant Echevarria on the morning of July 2, 2007, that

15 plaintiff had been vomiting all night and through the morning, with explosive diarrhea, and could

16 not eat, and requested immediate medical attention.  Taking plaintiff's allegations as true,

17 plaintiff has failed to demonstrate that defendant Echevarria acted with a culpable state of mind.

18 Defendant Echevarria declares that plaintiff did not appear ill.  Plaintiff presents no evidence

19 contradicting how defendant Echevarria viewed plaintiff.  Indeed, the description of plaintiff's

20 symptoms could be mistaken for the stomach flu, for which most people do not need or seek

21 medical care.  See Malone v. Ford, 2007 WL 6080431, *2 (E.D. Va. 2007) ("medical staff

22 diagnosed plaintiff with viral gastroenteritis, which is commonly referred to as the stomach flu.")

23 See also Metropolitan Life Ins. Co. v. Main, 383 F.2d 952 (5th Cir. 1967) ("Dr. Couch treated

24 Main . . . for gastroenteritis, usually called 24 to 48 hour flu by laymen.")

25       Although plaintiff contends defendant Echevarria refused to summon emergency medical

26 assistance, plaintiff's facts, taken as true, demonstrate defendant Echevarria had a difference of

opinion with plaintiff as to whether plaintiff required medical care.  It is also undisputed that plaintiff had access to running water, a toilet, and a bed during his illness.  As noted above, differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth Amendment violation.  Jackson, 90 F.3d at 332.  Thus, even taking plaintiff's facts as true, defendant Echevarria's failure to summon medical care on July 2, 2007, does not rise to the level of deliberate indifference.  Although plaintiff contends his pain and suffering could have been prevented had defendant Echevarria summoned emergency medical care for plaintiff, plaintiff adduces no evidence or expert medical opinion demonstrating that alleged fact.  The medical records reflect that plaintiff suffered from a virus, which is usually not treated by antibiotics.  Plaintiff complained of flu-like symptoms.  Plaintiff adduces no evidence demonstrating that defendant Echevarria was aware that plaintiff had gastroenteritis, or that plaintiff's symptoms would get worse.  It is undisputed that defendant Echevarria has had no formal training as a physician, nurse, or emergency medical technician.  Moreover, it is undisputed that defendant Echevarria's shift ended at 3:00 p.m. on July 2, 2007, and he was not working on July 3 or 4, 2007.  Because defendant Echevarria was not on duty, he cannot be held responsible for alleged delays in medical care from 3:00 p.m. on July 2, 2007, through July 4, 2007.  For all of these reasons, defendant Echevarria is entitled to summary judgment.

Plaintiff's allegations concerning correctional officers' alleged failure to summon medical assistance for plaintiff on July 1, 2007, fail for the same reasons.  While plaintiff maintains he required emergency medical assistance on July 1, 2007, he adduced no expert medical evidence demonstrating he required such emergency medical assistance, and correctional officers did not summon such assistance, raising an inference that they did not believe plaintiff required such urgent assistance.  Plaintiff adduces no evidence to the contrary.  Given the fact that plaintiff was in the early stages of his illness, and his symptoms were flu-like in nature, correctional officers' alleged failure to summon medical assistance on July 1, 2007, absent evidence to the contrary, constituted a difference of opinion as to the need for medical care, not deliberate indifference.

ii. Defendant Lyons

Plaintiff's allegations as to defendant Lyons also fail.  Plaintiff alleges that defendant Lyons was deliberately indifferent to plaintiff's serious medical needs on July 3, 2007.  It is undisputed that Lyons did not call for emergency medical assistance for plaintiff on July 3, 2007.  But it is also undisputed by credible evidence that defendant Lyons contacted the B-1 nurse in response to plaintiff's complaint, and notified Lyons' superior of plaintiff's complaints.[18]  While there are disputes of fact as to the verbal exchanges between plaintiff and defendant Lyons, taking plaintiff's allegations as true, defendant Lyons had a difference of opinion with plaintiff as to whether plaintiff required emergency medical treatment.  As noted above, plaintiff suffered from flu-like symptoms.  Furthermore, there is no indication that Lyons knew that plaintiff faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable steps to abate it.  See Farmer, 511 U.S. at 837.  Or, put differently, there is no indication that Lyons opted not to seek further medical treatment for plaintiff in conscious disregard of an excessive risk to plaintiff's health.  See Toguchi, 391 F.3d at 1058; Jackson, 90 F.3d at 332.  Plaintiff adduces no evidence demonstrating that defendant Lyons was aware that plaintiff's condition would get worse, or that plaintiff would become dehydrated.  It is undisputed that defendant Lyons has had no formal training as a physician, nurse, or emergency medical technician.

Moreover, it is undisputed that defendant Lyons' shift ended at 6:00 a.m. on July 3, 2007.  Medical records demonstrate that plaintiff presented at B-1 medical clinic at 10:00 a.m. on July 4, 2007.  Although plaintiff contends his pain and suffering could have been prevented had defendant Lyons earlier summoned medical assistance, plaintiff presents no evidence or expert medical opinion confirming such a conclusion.  The medical records reflect that plaintiff suffered from a virus, which is usually not treated with antibiotics, but has to run its course.  Taking

---

[18]  Plaintiff contends that the language "plaintiff's complaints" is ambiguous and does not relate the seriousness of plaintiff's request for emergency medical care.  (ECF No. 65 at 38.)  However, plaintiff was not privy to this conversation, and failed to adduce evidence to the contrary.

1   plaintiff's allegations as true, the court cannot find that the delay from July 3, 2007, to July 4,

2   2007, when plaintiff presented to the B-1 medical clinic, constituted an Eighth Amendment

3   violation.  See Estelle, 429 U.S. at 105-06.  In addition, plaintiff fails to demonstrate that any

4   delay attributable to defendant Lyons resulted in substantial harm.  While plaintiff experienced

5   pain and suffering from his vomiting and diarrhea, he presents no evidence that, absent earlier

6   treatment, his symptoms would have abated.  Indeed, plaintiff declares that he continued to suffer

7   from his condition even after he received medical treatment.  (ECF No. 65-1 at 10.)  For all of

8   these reasons, defendant Lyons is also entitled to summary judgment.

9                            iii.  Defendant Sheldon

10          Plaintiff's allegations as to defendant Sheldon fail for the same reasons as his claims

11  against defendant Lyons.  It is undisputed that defendant Sheldon did not physically observe

12  plaintiff on July 3, 2007, and thus, could only respond to the explanation of plaintiff's illness as

13  expressed by defendant Lyons.  Plaintiff was not present during the phone conversation between

14  defendants Lyons and Sheldon, and alleged no facts suggesting that any inmate was present

15  during this conversation.  Therefore, the court must take as true the statements of defendants

16  Lyons and Sheldon concerning this conversation.  The record reflects that defendant Lyons did

17  not subjectively believe that plaintiff required emergency medical care.  Absent facts

18  demonstrating that defendant Lyons informed defendant Sheldon that plaintiff's medical

19  condition required emergency care, plaintiff cannot demonstrate that defendant Sheldon was

20  deliberately indifferent by delaying plaintiff's medical care.  On this record, defendant Sheldon is

21  also entitled to summary judgment.

22                            iv.  Defendant Esberto

23          Plaintiff's claims against defendant Esberto fail for similar reasons.  It is undisputed that

24  defendant Esberto is a Registered Nurse, and there are disputes of fact as to whether defendant

25  Esberto was aware of plaintiff's condition on July 3, 2007.  Plaintiff does not indicate what time

26  on July 3, 2007, defendant Esberto allegedly saw plaintiff.  The Record of Daily Activity log

23

reflects plaintiff was seen by IDTT between 9:00 and 9:30 a.m.  (ECF No. 65-2 at 31.)  Thus, taking plaintiff's allegations as true, he would have advised defendant Esberto of his condition prior to 9:00 a.m. on July 3, 2007.  Because plaintiff was seen in the medical clinic at 10:00 a.m. on July 4, 2007, defendant Esberto's alleged failure to provide medical care to plaintiff on July 3, 2007, resulted in approximately a one day delay in treatment.

Deliberate indifference may be manifested by the intentional denial, delay, or interference with the plaintiff's medical care.  See Estelle, 429 U.S. at 104-05; Wakefield v. Thompson, 177 F.3d 1160, 1165 (9th Cir. 1999).  However, the defendant must purposefully ignore or fail to respond to the plaintiff's pain or medical needs.  See McGuckin, 974 F.2d at 1060.  Thus, an inadvertent failure to provide adequate medical care, or mere negligence or medical malpractice, or a mere delay in medical care (without more), or a difference of opinion over proper medical treatment, is insufficient to violate the Eighth Amendment.  See Estelle, 429 U.S. at 105-06 (inadvertent failure to provide adequate medical care is not "an unnecessary and wanton infliction of pain"); Wakefield, 177 F.3d at 1165 ("mere negligence in the provision of medical care does not constitute a constitutional violation"); see also Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989) (difference of opinion regarding medical treatment does not amount to deliberate indifference).

Taking plaintiff's facts as true, defendant Esberto was not deliberately indifferent to plaintiff's serious medical needs; rather, defendant Esberto had a difference of opinion with plaintiff as to the nature of, or misdiagnosed, plaintiff's condition.  Such a difference of opinion or misdiagnosis, even if grossly negligent, is insufficient to establish deliberate indifference. Estelle, 429 U.S. at 106.  Moreover, it is undisputed that plaintiff was treated the next day. Although plaintiff claims he needed emergency medical attention, plaintiff is not a doctor, and provides no medical evidence demonstrating he required emergency or earlier medical attention. Plaintiff adduces no evidence that he was dehydrated on the morning of July 3, 2007, or that defendant Esberto was aware that plaintiff was dehydrated.

1    The Ninth Circuit has made clear that "[w]hile poor medical treatment will at a certain

2    point rise to the level of a constitutional violation, mere malpractice, or even gross negligence

3    does not suffice." Wood, 900 F.2d at 1334; McGuckin, 974 F.2d at 1060 ("A finding that the

4    defendant's neglect was an 'isolated occurrence' or an 'isolated exception,' . . . militates against a

5    finding of deliberate indifference").  Even if plaintiff told Esberto that plaintiff suffered from

6    continuous vomiting and explosive diarrhea, Esberto's failure to provide urgent medical care for

7    plaintiff was, at most, grossly negligent in the absence of evidence that Esberto consciously

8    disregarded an excessive risk to plaintiff's health.  While plaintiff was certainly suffering from

9    the symptoms of gastroenteritis, an additional day of vomiting and diarrhea is not the type of

10   "substantial harm" that constitutes an Eighth Amendment violation.  See, e.g., O'Loughlin v.

11   Doe, 920 F.2d 614, 617 (9th Cir. 1990) (repeatedly failing to satisfy requests for aspirins and

12   antacids to alleviate headaches, nausea and pains is not constitutional violation; isolated

13   occurrences of neglect may constitute grounds for medical malpractice, but do not rise to level of

14   unnecessary and wanton infliction of pain); Anthony v. Dowdle, 853 F.2d 741, 743 (9th Cir.

15   1988) (no more than negligence stated where prison warden and work supervisor failed to

16   provide prompt and sufficient medical care); Wood, 900 F.2d at 1334, 1335 (affirming finding

17   that 11-day delay in treatment for broken orthopedic pin in inmate's shoulder did not cause

18   sufficient harm in part because "the only remedy immediately available was a prescription for

19   painkillers."); Mayfield v. Craven, 433 F.2d 873, 874 (9th Cir. 1970) (per curiam) (11-day delay

20   in treating inmate's "serious facial bone fractures" did not violate Eighth Amendment); Shapley,

21   766 F.2d at 407 (a five year delay in recommended knee surgery, without more, was insufficient

22   to state a claim of deliberate indifference because "delay in medical treatment must have caused

23   substantial harm" to constitute Eighth Amendment violation); cf. Hunt v. Dental Dept., 865 F.2d

24   198, 201 (9th Cir. 1989) (three-month delay in replacing dentures, causing gum disease and

25   possibly weight loss, may violate Eighth Amendment).  Here, plaintiff was suffering from a

26   virus, and plaintiff adduces no evidence demonstrating that earlier intervention would have

1   resolved his symptoms.

2       Moreover, mere delay in treatment, without more, is insufficient to demonstrate

3   deliberate indifference.  Plaintiff avers that he might have died.  However, plaintiff's claim that

4   he might have died is speculative, particularly in light of the vital signs registered on plaintiff's

5   arrival at the B-1 clinic on July 4, 2007.  (ECF No. 65-2 at 11.)  Plaintiff's vitals were recorded

6   as 97.6 degrees temperature, pulse rate of 86, respiration rate of 17, oxygen saturation rate of 97

7   percent, and blood pressure of 116/72.  (Id.)  All of these readings appear to be within normal

8   limits.  Plaintiff also weighed 170 pounds.  (Id.)  Thus, the physical examination of plaintiff did

9   not reveal he was on the verge of death, and none of the doctor's notes from the July 4, 2007

10  examination or monitoring during the IV fluids noted any such risk.  Plaintiff provided no

11  medical records demonstrating his weight prior to the instant illness.  Any speculation on

12  plaintiff's part as to possible future harm he might have suffered absent medical treatment is

13  insufficient to create a genuine issue of material fact.

14      In his reply to defendants' opposition to plaintiff's motion for summary judgment,

15  plaintiff cites the Merck Medical Manual, stating dehydration is a serious life-threatening

16  condition.  (ECF No. 76 at 4.)  Plaintiff also claims dysentery can be life-threatening if fluids

17  cannot be replenished in the body, and that these two conditions are exacerbated by high heat as

18  encountered by plaintiff from July 1 to 4, 2007.  (Id.)

19      While plaintiff strenuously argues that his condition was life-threatening, the court

20  assesses whether plaintiff's condition during the time he went without medical treatment

21  constituted a serious medical need.  As noted above, plaintiff was not subjected to high heat until

22  July 4, 2007, the day he was treated at the medical clinic.  The undisputed documentary evidence

23  demonstrates that plaintiff was initially diagnosed with viral gastroenteritis on July 4, 2007 (ECF

24  No. 65-2 at 12), and shortly thereafter, dehydration and gastroenteritis (ECF No. 65-2 at 13).

25  Contrary to plaintiff's hyperbole, the doctor did not assess either diagnosis as "acute," or

26  "serious," or "severe."  (Id.)  The doctor did not find that "plaintiff's body was shutting down"

(ECF No. 65 at 19) or that "plaintiff suffered a near-fatal catastrophe" (ECF No. 76 at 2).

Plaintiff was not diagnosed with dysentery.  (ECF No. 65-2.)  The July 4, 2007 doctor's notes do

not reflect that the gastroenteritis "caused a massive infliction of pain and suffering" (ECF No.

76 at 4, citing ECF No. 65-2), or was caused by "severe heat stress" (ECF No. 65 at 11).

The Merck Manual defines Gastroenteritis as:

> inflammation of the lining of the stomach and small and large
> intestines. . . .  Treatment is symptomatic. . . .  Gastroenteritis is
> usually uncomfortable but self-limited.  Electrolyte and fluid loss is
> usually little more than an inconvenience to an otherwise healthy
> adult but can be grave for people who are very young . . ., elderly,
> or debilitated or who have serious concomitant illnesses.

The Merck Manual for Health Care Professionals, merckmanuals.com (2010-2011),

http://www.merckmanuals.com/professional/index.html (last visited January 26, 2012).  The

Merck Manual sets forth a separate entry for gastroenteritis and dehydration, which directs the

reader to the treatment section under gastroenteritis which provides:

> •     Oral or IV rehydration
>
> •     Consideration of antidiarrheal agents if [certain] infection is not suspected
>
> •     Antibiotics only in select cases
>
> Supportive treatment is all that is needed for most patients.  Bed
> rest with convenient access to a toilet or bedpan is desirable.

Id.  Plaintiff provides no evidence demonstrating that he is very young, elderly, debilitated, or

was diagnosed with a concomitant serious illness, and the medical records for his July 4, 2007

treatment do not reflect these risk factors.  It is undisputed that plaintiff had access to a toilet, a

bed, and running water throughout the relevant time frame.  Because the Merck Manual states

that "[s]upportive treatment is all that is needed for most patients," and plaintiff has provided no

medical evidence to the contrary, defendant Esberto was not deliberately indifferent by failing to

provide earlier treatment.  Thus, defendant Esberto is also entitled to summary judgment.

////

v. <u>Delay</u>

Plaintiff fails to adduce evidence that earlier presentation at the clinic would have changed the outcome here.  Indeed, plaintiff states he continued to suffer from the condition even after he received medical treatment.  (ECF No. 65-1 at 10.)  At bottom, it appears plaintiff suffered from an episode of gastroenteritis and, because it was viral, rather than bacterial (which could be treated by antibiotics), the virus had to run its course.

Accordingly, plaintiff fails to demonstrate that he was seriously harmed by the delay.  <u>See</u> <u>McGuckin v. Smith</u>, 974 F.2d 1050, 1060 (9th Cir.1992); <u>see</u> also <u>Hallett v. Morgan</u>, 287 F.3d 1193, 1206 (9th Cir. 2002) (The Eighth Amendment is only violated if "delays occurred to a patient with problems so severe that delays would cause significant harm that defendants should have known. . . .")  Clearly it is miserable to suffer gastroenteritis in a prison cell.  The prisoner cannot obtain over the counter remedies to address diarrhea or vomiting.  However, plaintiff adduces no evidence demonstrating that the delayed treatment for gastroenteritis caused him significant future harm.  While plaintiff was treated with intravenous fluids for dehydration, it was for a period of a little over two hours, and plaintiff did not require admission to a hospital.  Plaintiff was released to his cell at 2:35 p.m., with orders to push liquids, eat a clear liquid diet for 24 hours, and to graduate to a regular diet as tolerated.

The infliction of pain may constitute an Eighth Amendment violation even if a delay in treatment does not impact further treatment.  <u>McGuckin</u>, 974 F.2d at 1060; <u>Gutierrez v. Peters</u>, 111 F.3d 1364, 1372 (7th Cir. 1997) ("delays in treating painful medical conditions that are not life-threatening can support Eighth Amendment claims"); <u>Brown v. Hughes</u>, 894 F.2d 1533 (11th Cir. 1990) (six hour delay in treating painful broken foot states an Eighth Amendment claim).  The needless suffering of pain may be sufficient to demonstrate further harm.  <u>Clement v. Gomez</u>, 298 F.3d 898, 904 (9th Cir. 2002) (prison officials may have been deliberately indifferent to prisoners' serious medical needs if officials aware of harmful effects of pepper spray and inadequacy of ventilation and yet purposefully refused showers and medical attention

to prisoners over four hour period).  Without downplaying the pain that plaintiff may have suffered, the court cannot find that the, at most, three day delay in treatment – a period of time a reasonable person might wait to seek medical treatment for a virus causing flu-like symptoms – was sufficiently long that it requires a jury's resolution of plaintiff's Eighth Amendment claim.

While plaintiff is correct that a prolonged episode of gastroenteritis and dehydration could possibly put his life at risk, plaintiff presents no competent evidence that a one day, or even a three day, delay in treatment put his life at risk.  Indeed, the medical records demonstrate that plaintiff's life was not at risk, and he was treated in the clinic with IV fluids for a little over two hours, and then released to his cell in stable condition.  Plaintiff adduces no evidence that he suffered significant harm based on the alleged delay in treatment.

For all of the above reasons, plaintiff fails to demonstrate that the delay in obtaining medical care violated his Eighth Amendment rights.  Taking plaintiff's allegations as true, no reasonable jury could find that defendants violated plaintiff's Eighth Amendment rights.

### 3.  Conclusion:  Medical Care Claim

In light of the above, defendants' motion for summary judgment should be granted.

## VII.  Qualified Immunity

Because the court has found that the conduct alleged by plaintiff does not state a constitutional deprivation, the court need not address defendants' arguments for qualified immunity.

## VIII.  Conclusion

IT IS HEREBY RECOMMENDED that defendants' November 8, 2012 motion for summary judgment (ECF No. 111) be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  July 15, 2013

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

heil2721.msj2